No. 47,246

STATE OF KANSAS, *Appellee*, v. PAUL DALTON BETTS, *Appellant*.

(519 P. 2d 655)

Opinion filed March 2, 1974.

*J. Stephen Nyswonger*, of Braun and Nyswonger, of Garden City, argued the cause, and *Lelyn J. Braun*, of the same firm, was with him on the brief for the appellant.

*Harrison Smith*, county attorney, argued the cause, and *Vern Miller*, attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

FOTH, C.: Appellant Paul Dalton Betts was convicted of involuntary manslaughter on a charge that while driving his automobile under the influence of intoxicating liquor he struck and killed a pedestrian. His primary contention on appeal is that the state's only evidence of his intoxication was too remote in time to be

admissible or to provide the basis for a reasonable inference of intoxication at the time of the accident. He stipulated before trial that he was driving the automobile that struck the deceased, and that she died as a result.

The deceased, Reiko Iwatani, was a musician with the Mitch Miller orchestra. We are told she was a citizen of Japan. The orchestra had given a concert in Garden City on the evening of October 19, 1972, and after the concert she and other members of the orchestra returned to their quarters at the Continental Motel on the south side of Jones Avenue, a four-lane street carrying U. S. Highway 50. Late in the evening she and Mary Lou Steppacher, another musician, went out for a midnight snack at the Flamingo Inn, located a little west of the Continental and across the street to the north.

Shortly after midnight the two headed back toward their motel, and were joined in the Flamingo parking lot by a third musician, James Boyd. The three of them crossed Jones Avenue to the south edge and, because there were no sidewalks and the grass was wet from an earlier rain, proceeded east in the street near the curb. They were, therefore, walking along the right edge of the street, with eastbound traffic.

Mr. Boyd testified that as they walked he regularly looked over his shoulder for approaching cars. Whether he saw appellant's car approaching does not appear in the record. Miss Steppacher also kept a lookout for traffic; she saw none coming from the east, but did see appellant's car coming up behind them. When she saw it "veering into the outside lane of traffic" she tried to warn her companions, but was too late. She heard a thud, and later realized that Mrs. Iwatani had been hit.

A third witness to the incident was Ronald Brown, yet another member of the orchestra. He was standing in the Flamingo parking lot when he saw the appellant's car approaching. To him the car seemed to be "bumping along the curb." When he heard the screaming and saw the commotion he called an ambulance.

Both Boyd and Brown testified that appellant's car appeared to be traveling at a lawful rate of speed before the impact. (The speed limit dropped from 40 to 30 m. p. h. at about this point.) Boyd added that the car didn't appear to speed up afterward or speed away. Neither did it stop.

Officer Robert Seymour of the Garden City police department

was on patrol when he received the accident call at about 12:16 a. m. on October 20; he arrived at the scene at 12:17. After completing his on-the-scene investigation he commenced a street-by-street search for the light colored station wagon which witnesses described as the fatal instrumentality. At about 1:40 he received a call that the car had been located, and proceeded to an apartment that turned out to be appellant's.

There he joined Sergeant James Toner of the police department and Officer Cook of the Finney county sheriff's office. After a cursory examination of the station wagon the three officers approached appellant's apartment at about 1:50 or 1:55 a. m. Appellant's daughter answered the door, and appellant invited the officers in. They "advised him of his rights" and asked him to dress and come down to the police station with them.

Officer Seymour was permitted to testify, over appellant's objection, that he noticed the smell of alcoholic beverage on appellant's breath, that his concentration was impaired, that it took him an abnormally long time to tie his shoes, that his speech was slurred, and that he seemed to be "incoherent as to what was really going on." In Officer Seymour's opinion appellant was intoxicated. Later that morning, about 3:00, he again saw appellant at the police station and concluded that at that time "he was still intoxicated."

Sergeant Toner also told of going to appellant's apartment, reading him the Miranda warning, and asking him to go to the police station. He described appellant as follows:

"Well, his speech was slurred. He wasn't walking very straight. He had quite a time getting his shoes on, getting them tied, putting his shirt on. He seemed like he didn't know really what was going on about him."

Asked his opinion of appellant's condition, Sergeant Toner testified, "I believe the man was drunk."

The sergeant also told about his police station interrogation of the suspect between 2:15 and about 2:45. Without objection he read to the jury his memorandum of that interrogation:

"Question: 'Were you at the Continental Club that evening?' His answer was 'yes, (sic) left there about quarter of 12:00 midnight.' Question: 'Where did you go then?' Answer: 'Don Farr picked me up some bread for steaks at the Quik Shop and came back about 11:30 or so; I don't know exactly.' Next question: 'What time did you leave for home?' His answer was: 'About quarter of 12:00, about that time. What is this about?' Statement by myself was 'We believe you were involved in an accident we are checking on.' Statement by Mr. Betts: 'I was not involved in any accident tonight. I did not hit

*any other cars. Go check my station wagon. I didn't hit any other car.'* Last question: 'Which way did you go home from the club?' His answer was: 'Highway 50 to Five Points and on down the street that we changed on over to Gardendale. A Corvette cut me off by the curb when I left.' Question by Betts: 'Where was I involved in this accident?' Answer by myself: 'By the Continental Motel.' Statement by Betts: *'I didn't have an accident by the motel.'* Question: 'Were you driving your station wagon tonight?' Answer: 'You bet.' Question: 'No one else drove it except Farr who went to the Quik Shop for bread and returned?' His answer was 'Right'." (Emphasis added.)

The interrogation was broken off by Captain Richard Rohleder, who arrived at the police station around 3:00 a. m. He had been to the hospital, where he learned that Mrs. Iwatani had died, and to appellant's apartment, where he had removed her motel key from the crevice between the hood and fender of appellant's station wagon. Asked his opinion of appellant's condition the captain replied, "he wasn't what you call drunk but he had too much to drink in him yet to question him on something that he might not understand too good afterwards." His opinion was based on numerous previous encounters with appellant, both drunk and sober.

Five of appellant's six points on appeal turn on the probative value to be ascribed to the officers' testimony as to his intoxication: Seymour's at 1:50 and 3:00; Toner's at 1:50; and Rohleder's at 3:00. The accident, it may be recalled, occurred no later than 12:15. His basic contention is that drunkenness one-and-one-half to almost three hours later is too remote to demonstrate drunkenness at the time of the accident. Hence, he argues: (1) he should have had a dismissal at the close of the state's case; (2) the verdict was not supported by the evidence; (3) the evidence of intoxication was erroneously admitted; (4) an instruction on intoxication should not have been given because not based on substantial evidence; and (5) a mistrial should have been declared because of all the foregoing errors.

In analyzing this overall contention it must be borne in mind that, by virtue of a pre-trial oral amendment of the information, appellant was charged with involuntary manslaughter under K. S. A. (1972) Supp. 21-3404:

"Involuntary manslaughter is the unlawful killing of a human being, without malice, which is done unintentionally in the commission of an unlawful act not amounting to felony, or in the commission of a lawful act in an unlawful or wanton manner. . . ."

To sustain its case under this statute it was incumbent on the state to prove two elements: first, an unintentional killing; and second,

that appellant was at the time either engaged in the commission of a misdemeanor or was operating his car in a wanton manner. There was no question as to the first element; the homicide was conceded. As to the second, the state became committed to the "misdemeanor" theory when the trial court instructed without objection from the state that in order to convict, the jury had to find that the appellant was driving a motor vehicle while under the influence of intoxicating liquor. Wantonness was never an issue in the case.

Did the evidence of appellant's drunkenness afterwards have any probative value as to his condition at the time of the accident? If it did, our inquiry is at an end, for it would then be admissible for such weight as the jury might choose to give it. Our test on appeal, of course, is whether there was a reasonable inference of guilt to be drawn by the jury, not whether the evidence establishes guilt beyond a reasonable doubt. *State v. Ulriksen*, 210 Kan. 795, 504 P. 2d 232, Syl. ¶ 5; *State v. Kliewer*, 210 Kan. 820, 504 P. 2d 580, Syl. ¶ 5.

Appellant cites, and we have been able to find, no Kansas case where evidence of drunkenness after the fact was held to be too remote. He does cite cases such as *State v. Grimes*, 193 Kan. 294, 392 P. 2d 926, which illustrate that in the garden variety driving-under-the-influence case, where there is an accident or an officer stops an erratic driver, the evidence of intoxication is based on observations made shortly after the time the accused was driving. The same kind of time frame was also present in *State v. Townsend*, 146 Kan. 982, 73 P. 2d 1124, a manslaughter case, where the court recognized that drunkenness immediately after a collision provided grounds for inferring that the defendant had done his imbibing beforehand. Such cases lend little, if any, support to appellant's position. Indeed, in *State v. Hayden*, 126 Kan. 799, 271 Pac. 291, cited by him, the evidence of the defendant's drunkenness consisted largely of observations made a considerable time after the driving in question. The defendant had swerved on the highway, hitting and forcing another car off the road. His victim got the license number from a passing motorist, secured help, got his car out of the ditch, drove four miles to the town where defendant lived, located the defendant's house, was refused admittance, and secured the assistance of the town marshal. It was the testimony of the officers who took him into custody as to his condition at that time which was relied on to show that defendant was under the influence

back at the time of the accident. That testimony, together with his earlier weaving on the road, was sufficient to uphold his conviction.

Looking to cases from other jurisdictions we find a variety of results, depending upon the circumstances of each case. Where the *only* evidence of intoxication was the subsequent observations, an interval of two hours has been regarded as too long to give the evidence probative value. *Hall v. Young*, 218 Ark. 348, 236 S. W. 2d 431, 20 A. L. R. 2d 1207. Cf. *Gream v. Miller* (Ky., 1951), 243 S. W. 2d 502; *Rawlings and Spivey v. Commonwealth*, 191 Ky. 401, 230 S. W. 529.

On the other hand, where there was other evidence of drinking, a doctor's observations two-and-three-quarters hours after the accident were admissible in *Reedy, Appellant v. Brown*, 395 Pa. 382, 150 A. 2d 707. And where "There was evidence of the manner in which the car was driven, and of bottles smelling of whiskey in the car driven by defendant, having a tendency to prove intoxication," the admission of evidence that defendant was drunk *eight or ten hours* after the collision was held not to be prejudicially erroneous. *Nail v. State*, 33 Okla. Crim. 100, 109, 242 Pac. 270. The court there observed, "It was a matter proper to be submitted to the jury, and the remoteness in point of time goes rather to its weight than to its admissibility." (Id.)

The Oklahoma court's comment is in accord with our own holdings dealing with "remoteness" in general. In *Adrian v. Elmer*, 178 Kan. 242, 284 P. 2d 599, we held "Whether evidence is too remote to be admissible rests within the sound discretion of the trial court." (Syl. ¶ 7.) The evidence there objected to was a fertility test made a year after the sale of a bull; this was claimed to be too remote to show his condition at the time of the sale. In holding there was no error, this court said, "The admissibility of this evidence was a matter to be determined by the trial court, and the weight of the testimony was for the jury." (Id., p. 247.) See also, *State v. Calvert*, 211 Kan. 174, 505 P. 2d 1110, Syl. ¶ 4; *Tucker v. Lower*, 200 Kan. 1, 434 P. 2d 320; *State v. Schuman*, 151 Kan. 749, 751, 100 P. 2d 706.

All in all, we think the proper test is aptly stated in *Bentley v. Ayers*, 102 Ga. App. 733, 117 S. E. 2d 633. There testimony of an officer that the defendant was intoxicated an hour and a half after the accident was held to be properly excluded when it was unsupported by any other evidence that he was drinking prior to or at the time of the accident. In so holding the court said:

". . . In a ruling on such a matter the trial judge must exercise his broad discretion. Not only is the length of time between the accident and evidence of intoxication an important factor but all other testimony relevant to such an issue, such as testimony that prior to the accident the defendant seemed to exercise a lack of control of his vehicle or that he had been seen drinking prior to the accident, and other such relevant testimony as would guide the trial judge in rendering his decision." (P. 736.)

In applying such a test to the case at bar we look to see what evidence, other than the opinions of the officers, might substantiate the charge that appellant was under the influence of intoxicating liquor at the time he struck the deceased. We find the testimony of Miss Steppacher that his car "veered" from the center lane to the outside; Mr. Brown's testimony that the car seemed to be "bumping along the curb;" the fact that he did not stop and yet took no obviously evasive action; and the fact that he self-righteously denied participation in the accident a few hours later. (Compliance with his demand that the officers "Go check my station wagon" would, of course, have produced the incriminating motel key.) This combination of circumstances, we think, cried out for an explanation. His intoxication when the officers found him supplied that want. It furnished a ready answer as to why he was driving erratically before the accident, why he departed the scene with apparent unconcern, and why he had no apparent recollection of his involvement in any untoward incident.

In this case, then, the fact that appellant was drunk some time after the accident did have probative value as to his condition at the time. Such evidence was therefore admissible and, together with the other evidence referred to, provided a basis from which the jury could well have inferred his guilt. Appellant's five points on appeal enumerated above are therefore without merit.

His final point is a claim that the court should have instructed the jury on the contributory negligence of the deceased. He concedes that contributory negligence, as such, is not a defense in a homicide case. *State v. Pendleton,* 144 Kan. 410, 61 P. 2d 107; *State v. Custer.,* 129 Kan. 381, 282 Pac. 1071; *State v. Bowser.,* 124 Kan. 556, 261 Pac. 846. He does contend that the jury should have been instructed to take the deceased's conduct into account in determining causation, as indicated by those cases.

It is clear that all the circumstances of the deceased's conduct were before the jury, *i. e.,* that she was walking on the wrong side of the road at night. Likewise before the jury was appellant's

stipulation that he was driving his car, that it was his car that struck the deceased, and that she died as a result of the striking. Thus the fact that appellant was an effective cause of Mrs. Iwatani's death was stipulated.

Appellant's requested instruction is not in the record, so we are somewhat handicapped in assessing this claim. To acquit, the jury would have had to find that her conduct was the *sole* cause of her death—that appellant's drunkenness had nothing to do with it. While perhaps the jury should have been instructed that they could so find, there was absolutely nothing in the evidence which would fairly support such a finding. Thus, even if the requested instruction took this tack we cannot say that its refusal resulted in prejudice.

Moreover, we are inclined to doubt that such was the thrust of the missing instruction. In his points relied on appellant puts his argument this way:

"The Court erred in refusing the defendant's proposed instruction relating to the deceased's act as contrary to the laws of the State of Kansas and the Ordinances of the City of Garden City, Kansas."

If, as this language indicates, his request was actually aimed at the fact that walking on the wrong side of the road is a violation of our statutes and of some ordinance of the city of Garden City, its refusal was clearly proper. There was testimony, objected to but not stricken, that walking with traffic violated a city ordinance. But the fact of violation would at best go to show contributory negligence, which he now concedes is no defense.

In either event, we are unable to ascertain prejudicial error in refusing the requested instruction, whatever it may have been.

The judgment is affirmed.

APPROVED BY THE COURT.