No. 51,189

STATE OF KANSAS, *Appellee,* v. NORMAN ROY FENTON, *Appellant.*

(620 P.2d 813)

Opinion filed December 6, 1980.

*Myrlen L. Bell,* of Hall & Bell, of Medicine Lodge, argued the cause and was on the brief for the appellant.

*Richard N. Raleigh,* county attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Thomas D. Haney,* assistant attorney general, were with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal in a criminal action from a jury verdict finding Norman Roy Fenton (defendant-appellant) guilty of first-degree murder (K.S.A. 21-3401). The appellant raises five issues on appeal. He contends the trial court erred in (1) permitting the jury to view trial exhibits a second time prior to retiring for deliberations; (2) refusing to permit the appellant to question the jury about events occurring during deliberations; (3) refusing to grant a new trial after the disclosure of outside communications to the jury; (4) admitting testimony of a sheriff's matron; and (5) that there was insufficient evidence of premeditation.

The facts are not complex, but are lengthy because of their circumstantial nature. On the evening of November 28, 1975, twenty-five-year-old Jan E. Fenton was murdered in the bathroom of her home in Sharon, Kansas. She was shot in the face with a single .22-caliber bullet. Mrs. Fenton's husband, the appellant, reported the murder to authorities at about 10:30 p.m. on the night it occurred. In a statement to the authorities the appellant stated that Mrs. Fenton was alive when he left their home about 9:30 p.m. and drove to Medicine Lodge for beer, cigarettes and baby food. He returned about 10:30 p.m. and discovered his wife dead.

The sheriff and KBI investigators conducted a thorough examination of the crime scene, the victim, and any persons believed to have information concerning the murder. The appellant was the principal suspect, but was not arrested or charged at that time.

Three years after the murder, in October 1978, two teenage boys were scavenging for lost fishing lures at the Barber County State Lake; the lake had recently been partially drained to facilitate repair of the dam. The lake is located a few miles north of Medicine Lodge, and northeast of Sharon. The boys discovered a .22-caliber rifle submerged in the exposed lake bed. They cleaned the rifle, fired some shells in it, then turned it over to law enforcement authorities.

KBI agents conducted ballistics tests with the rifle. They compared spent .22-caliber shell casings with two spent .22-caliber shell casings which were found the night of the murder. The two .22-caliber shell casings were found lying on the floor of the Fenton home, just outside the bathroom door. Investigators had

determined that two bullets had been fired at Mrs. Fenton. One bullet missed and exited through the bathroom window, leaving small holes in the curtain, main window, storm window and screen. The second bullet struck Mrs. Fenton in the face, severed the spinal cord, and lodged in the first vertebrae. The ballistics tests indicated the two shell casings found in the Fenton home were probably fired in the .22-caliber rifle which was found in the lake.

The rifle was identified as the same make as one which belonged to the appellant. The night of the murder the appellant reported to the sheriff and KBI agents that his rifle must have been stolen by the murderer.

The discovery of the murder weapon provided the county attorney with sufficient additional evidence to support the filing of a criminal complaint charging the appellant with first-degree murder. At the trial in April 1979, the following additional evidence was presented.

Over the appellant's objection, the State presented the testimony of LoVae Blunk. Mrs. Blunk was the sheriff's wife and occasionally assisted the sheriff as a matron. Mrs. Blunk testified that on February 10, 1975, she met the deceased, Mrs. Fenton, after the appellant sought a court order for the protective custody of Mrs. Fenton. The Fentons had become embroiled in a marital dispute, culminating in Mrs. Fenton throwing a butcher knife at the appellant. Mrs. Blunk testified that she sat in on conversations between the Fentons and the county judge, and between the Fentons and the county medical officer. The focal point of Mrs. Blunk's testimony was the following:

"Dr. Stucky told them that they could leave, at which time, Mrs. Fenton asked Norman if he was ready to go home and he said, 'Yes, but if this happens again, I'll kill you.' "

Mrs. Blunk further testified that Mrs. Fenton told Dr. Stucky that she and the appellant always threatened each other during arguments, but they did not mean it. Mrs. Blunk testified with the aid of written notes which she prepared in November 1975, after the murder, and nine months after the statements were made.

Dr. Charles Atwater, a psychologist with the area mental health institute, testified that he counseled with the appellant and Mrs. Fenton once in March and again in April 1975. Dr. Atwater counseled the Fentons regarding fairly common marital com-

plaints. Mrs. Fenton complained about lack of attention, lack of communication, money disputes, and the appellant's occasional excessive drinking. The appellant complained about Mrs. Fenton's nagging on the same subjects. Dr. Atwater testified that the Fentons desired to save the marriage because they had recently learned Mrs. Fenton was pregnant.

Duane Bell, a KBI agent, testified concerning his investigation of the crime scene, and his interrogation of the appellant. He testified that the appellant described his activities on the day of the crime, and explained his absence for the one-hour period when Mrs. Fenton was allegedly shot. The appellant said he came home around 6:30 p.m. and shortly thereafter his wife began feeding the baby and preparing supper. At 9:30 p.m. he left and drove to Medicine Lodge to buy beer, cigarettes and baby food. The appellant discovered the grocery store was closed, and went to a tavern where he purchased two six-packs of beer and two packages of cigarettes. When the appellant returned home he found his wife lying in a pool of blood on the bathroom floor; he grabbed her leg, which was limp, and believed she was dead. He then called the sheriff.

Officer Bell further testified to several things he found during his investigation which tended to impeach the appellant's story. There was no sign of forced entry, struggle, attempted rape, or any other evidence which might indicate an outside party killed Mrs. Fenton. Officer Bell found three or four full packages of cigarettes in the house, and two partial cigarette packages. These were in addition to the two cigarette packages the appellant purchased at the tavern. There were also a few cans of baby food and formula in the refrigerator. Supper had not been eaten that evening; partially fried hamburger and potatoes were still in skillets on the stove.

Sheriff John Blunk testified that when he arrived at the Fenton home, the appellant kept saying that someone shot his wife. Deputy Roud French testified that about midnight he heard the appellant ask the coroner where Mrs. Fenton had been shot. Both officers testified that at that time it had not been determined that Mrs. Fenton had been shot. Because of the position of the victim's body on the bathroom floor, an observer could not see the wound, only blood. Dr. Ball, the coroner, also testified that

because of the position of the victim's body on the floor, the cause of death was not immediately ascertainable.

Dr. William Eckert performed an autopsy on Mrs. Fenton. He testified there was no signs of defensive wounds, attempted rape, or attempted theft of the victim's wedding rings.

Detective Dennis Radke, of the Reno County Sheriff's Office, testified that in February 1979, he was contacted by Norma Lambert, in reference to an unrelated crime. Norma Lambert was the appellant's twenty-three-year-old daughter by his first marriage. Norma told Detective Radke that the appellant killed Jan Fenton. Norma gave a statement to Detective Radke, which was transcribed by a court reporter and admitted at the trial. In the statement Norma testified that she resided with the appellant and his third wife for about four months in 1977. Norma stated that on three separate occasions the appellant, under the influence of alcohol, made statements indicating he had shot Mrs. Fenton.

Additional evidence presented by the State showed that the Fentons applied for life insurance policies on themselves and on their newborn baby, in October 1975. The applications were made after a life insurance salesman, Otis Lichlyter, solicited the applications. The appellant did not request life insurance, but applied at the same time as Mrs. Fenton. Mrs. Fenton was accepted for a $20,000 term policy, with triple indemnity for accidental death ($60,000). The appellant's application for an identical policy was rejected for an undisclosed reason, after the death of Mrs. Fenton. In 1976 the appellant collected $60,805 from the policy on his wife.

Jan Fenton's mother and sister also testified at the trial. They said the appellant gave custody of the seven-week-old baby boy to the sister shortly after the murder. Within a year, the sister adopted the baby with the appellant's consent. The sister told the appellant she did not want any of the insurance money for the child, and the appellant never used any of the insurance money for the child's benefit.

There was also testimony that the appellant remarried within a few months after the murder. There was testimony that the appellant may have been acquainted with his third wife prior to Mrs. Fenton's death.

The appellant did not testify in his defense, but presented testimony to discredit Norma's testimony. The appellant also presented testimony of his presence in the tavern to buy beer and

cigarettes the night of the murder, at about 10 p.m. A copy of a cancelled check for $6 was admitted into evidence. The appellant presented testimony of a non-expert witness who viewed the crime scene; the witness opined that a person six-feet tall or taller must have shot Mrs. Fenton. The witness testified after examining the path of the bullet through the bathroom window. The appellant is less than six-feet tall.

At oral argument, the appellant emphasized his contention that the trial court erred in not granting a new trial because of prejudicial outside communications, by persons unknown, with members of the jury. We will confront that issue first.

Several days after the trial, a juror told the appellant the jurors had heard a threat that the appellant would kill the jurors if he was convicted. Upon the appellant's motion, the trial court held an evidentiary hearing to determine the nature and source of the threat, and whether the threat had a prejudicial effect on the appellant's rights. The parties have submitted an agreed statement of facts summarizing the hearing, pursuant to Supreme Court Rule 3.05. In pertinent part the agreed statement is as follows:

"2. That an evidentiary hearing was had on the 21st day of May, 1979, concerning the Defendant's Motion for an evidentiary hearing to take testimony of the members of the jury. The following constitutes the findings of fact and the rulings of the trial judge concerning said hearing:

"a) That the trial judge ruled that the Defendant could question the jury only as to whether or not the various members had heard that the Defendant had threatened to kill members of the jury if he was convicted; when they had heard such statement; and, to determine the source of said threat.

"b) That the essence of the threat that was communicated to the jury was that if the Defendant was convicted by the jury the Defendant would kill the members of the jury.

"c) That three jurors had testified that they had heard about the threat prior to jury deliberation in this matter.

"d) That the remaining nine jurors had heard about the threat while still in the jury room but only after the verdict had been determined.

"e) That the trial judge questioned the members of the jury as to what effect, if any, the threat had upon their deliberation and determination in this matter. Such questioning by the trial judge was objected to by the Defendant citing K.S.A. 60-441 as authority for such objection.

"f) That all the members of the jury stated that they considered the threat as a rumor and that it did not effect [sic] their decision in this matter."

The appellant contends the outside communication to the jurors raised a presumption of prejudice, which the State has

failed to rebut. The appellant relies on *Remmer v. United States,* 347 U.S. 227, 229, 98 L.Ed. 654, 74 S.Ct. 450 (1954); *Mattox v. United States,* 146 U.S. 140, 36 L.Ed. 917, 13 S.Ct. 50 (1892); and *United States v. Greer,* 620 F.2d 1383 (10th Cir. 1980). The presumption of prejudice applied in federal courts is not founded upon a constitutional basis, and is not binding on the states. *People v. Hunter,* ⸻ Colo. App. ⸻, ⸻, 607 P.2d 1026 (1979); see *Murphy v. Florida,* 421 U.S. 794, 44 L.Ed.2d 589, 95 S.Ct. 2031 (1975).

In recent years, this court has consistently adhered to the rule, in both civil and criminal cases, that juror misconduct is not a ground for reversal, new trial, or mistrial unless it is shown to have substantially prejudiced a party's rights. The party claiming prejudice has the burden of proof. See *State v. Jakeway,* 221 Kan. 142, 148, 558 P.2d 113 (1976); *State v. Arney,* 218 Kan. 369, 371-72, 544 P.2d 334 (1975); *Roy v. State,* 213 Kan. 30, 32, 514 P.2d 832 (1973); *State v. Duncan,* 3 Kan. App. 2d 271, 275, 593 P.2d 427 (1979). Juror misconduct is a broad label which has been used to describe communications with jurors from outsiders, witnesses, bailiffs, or judges; and actions by jurors in the unauthorized viewing of premises, or reading of newspaper articles. See Annot., 9 A.L.R.3d 1275; Annot., 41 A.L.R.2d 227; and cases cited above.

On this issue the record on appeal is limited to the agreed statement of facts, and the transcript of the motion for new trial. We are satisfied the trial court did not abuse its discretion in finding the appellant failed to show substantial prejudice to his rights. No one knew the source of the threat, which the appellant denied making. Only three jurors heard about the threat prior to deliberations. The threat was not discussed until after the verdict was reached. The remaining nine jurors then heard about the threat. The fact that three jurors had heard about the threat was not discovered until after the trial. All jurors told the trial judge the threat was considered a mere rumor and did not affect their deliberations.

The appellant complains that the trial court erred in questioning the jurors as to the effect the threat had upon their deliberations. The agreed statement of facts recites "[t]hat all of the members of the jury stated that they considered the threat as a rumor and that it did not effect [*sic*] their decision."

The two statutes pertinent to this question are K.S.A. 60-441, and K.S.A. 60-444. K.S.A. 60-441 states:

"Upon an inquiry as to the validity of a verdict or an indictment no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined."

K.S.A. 60-444 states:

"This article shall not be construed to (a) exempt a juror from testifying as a witness to conditions or occurrences either within or outside of the jury room having a material bearing on the validity of the verdict or the indictment, except as expressly limited by K.S.A. 60-441; (b) exempt a grand juror from testifying to testimony or statements of a person appearing before the grand jury, where such testimony or statements are the subject of lawful inquiry in the action in which the juror is called to testify."

The trial court did not violate the limitations imposed by 60-441, when the jurors were questioned about the effect of the threat upon their decision. The threat was not a matter which had been placed in evidence or a matter inhering in the verdict itself. K.S.A. 60-444 permits inquiry into extraneous matters which may have a material bearing upon the validity of the verdict.

Closely related to the legal principles just discussed is the appellant's contention that the trial court erred in refusing to permit the appellant to ask certain questions at the evidentiary hearing. The agreed statement of facts provides:

"g) That the trial judge disallowed all other questioning on all other matters raised in the Defendant's Motion for an evidentiary hearing. Defendant cited K.S.A. 60-444 as authority for such questioning.

"h) That in support of his request to question jurors concerning other matters contained in his motion for evidentiary hearing the Defendant proffered the following:

"1. That the jury discussed and decided that any gun that was left in a house would be empty; that the Defendant would have to take time to load the gun and that this would be sufficient to constitute the element of premeditation.

"2. That the jury determined that the testimony of Norma Lambert was not creditable and should not be used in their deliberations and determination in this matter."

The appellant contends the discussion of the jury members concerning the loading of the gun amounts to an improper consideration of facts which are not in evidence.

The determination of the element of premeditation by the jury

is a matter which inheres in the verdict. K.S.A. 60-441 prohibits exploration of the jury's deliberations on that subject, and the trial court properly denied the appellant the right to question the jurors on this matter. Similarly the trial court properly denied the appellant the right to question jurors concerning the credibility they placed on the testimony of Norma Lambert.

It is the prerogative of a jury to determine the credibility of witnesses, the weight to be given the evidence, and the reasonable inferences of fact which may be drawn from the evidence. *State v. Duncan,* 221 Kan. 714, Syl. ¶ 1, 562 P.2d 84 (1977). Jurors have the right to use that knowledge and experience which they possess in common with men in general. *State v. McNichols,* 188 Kan. 582, 589, 363 P.2d 467 (1961). See PIK Crim. 51.01.

The appellant contends there was insufficient evidence of premeditation, and cites *State v. Hamilton,* 216 Kan. 559, 566, 534 P.2d 226 (1975), where this court stated: "As a general principle it would seem that use of a deadly weapon, standing alone, is not sufficient to establish premeditation." In *Hamilton* the court stated:

"While use of a deadly weapon is not alone sufficient to infer premeditation it is one of the circumstances which may be considered in determining whether a homicide was committed with deliberation. We find this discussion set out in 1 Wharton's Criminal Evidence, [13th Edition, § 135] pp. 226, 227:

" 'According to some courts, if, in addition to the use of a deadly weapon, another circumstance is shown, such as the lack of provocation, the evidence may be of such probative force as to give rise to a presumption, as opposed to a mere inference that the homicide was premeditated and deliberate, thereby casting upon the defendant the burden of going forward with appropriate evidence to explain away such presumption. According to other courts, the existence of premeditation and deliberation which will raise the homicide to murder in the first degree may not be the subject of a legal presumption, but is a matter of inference which the trier of fact may or may not see fit to draw.

" 'Premeditation and deliberation can be found from various circumstances, such as the nature of the weapon used, the lack of provocation, the defendant's conduct before and after the killing . . . .' " 216 Kan. at 567.

See *State v. Henson,* 221 Kan. 635, 639-40, 562 P.2d 51 (1977).

Here it was proper for the jury to consider that the appellant's own rifle was the murder weapon; that there were no defensive wounds on the victim; no signs of struggle or rape; and no evidence of provocation. There also was testimony the appellant had threatened to kill his wife. The jury could find from the evidence that the appellant had cleverly disposed of the weapon

after its use, when he made the trip to Medicine Lodge via the Barber County State Lake, to cover up his deed.

The appellant contends the trial court erred in permitting the jury to view 23 State exhibits a second time prior to its deliberations with only the bailiff in charge to supervise the viewing. Once a case is submitted to the jury for deliberations, the jury is ordinarily given the exhibits to take into the jury room where the jurors can examine the exhibits as many times as they desire. Here, the appellant offers nothing to show that his rights were prejudiced in any way. The manner in which exhibits are handled at trial is within the trial court's discretion, and will not be disturbed except in cases of abuse. See *State v. Stiff,* 148 Kan. 224, 227, 80 P.2d 1089 (1938); *State v. Moore,* 80 Kan. 232, Syl. ¶ 5, 102 Pac. 475 (1909).

The appellant contends the trial court erred in admitting the testimony of LoVae Blunk. Mrs. Blunk testified the appellant had threatened to kill his wife ten months earlier. The agreed statement of facts reads:

"1.   That an evidentiary hearing was had concerning the admissibility of the testimony of LoVae Blunk on or about the 9th day of March, 1979 and the following are objections raised by the Defendant to such testimony and the Courts' rulings thereon.

"a)   The Defendant objected to the testimony of LoVae Blunk as hearsay.

"b)   That the Defendant objected to the testimony of LoVae Blunk by reason that the same was irrelevant and immaterial because of the remoteness and time and the lack of any logical connection between the marital dispute on February 10, 1975 and the homicide on November 28, 1975.

"c)   That the Defendant objected to said testimony because the same was inadmissible as it tended to be evidence of specific prior conduct or evidence of defendant's character to prove his guilt contrary to K.S.A. 60-447.

"d)   That there was little or no probative value in the testimony of LoVae Blunk and such probative value was far outweighed by the prejudice created by [*sic*] the Defendant.

"e)   That the trial judge found the testimony of LoVae Blunk to be admissible and that the objections raised by the defendant went to the weight of the evidence, not its admissibility."

Although Mrs. Blunk's testimony recounted a specific instance of the appellant's conduct, *the evidence was not offered to prove a trait of the appellant's character.* In *State v. Patterson,* 200 Kan. 176, Syl. ¶ 2, 434 P.2d 808 (1967), the court stated:

"In a case of marital homicide, evidence of a discordant marital relationship,

and of the defendant's previous ill treatment of his wife, including his prior threats to kill her, is competent as bearing on the defendant's motive and intent."

See *State v. Anicker,* 217 Kan. 314, Syl. ¶ 1, 536 P.2d 1355 (1975).

The appellant contends the threat was too remote in time to be material or relevant. In *State v. Anicker,* 217 Kan. at 315-16, testimony that the defendant had assaulted and beaten the deceased in November 1968 was held relevant and admissible where the crime in question occurred seven months later in May. Here, the murder occurred on the eve of the appellant's first wedding anniversary. Evidence of marital discord during the first months of that marriage is not so remote as to be inadmissible. Whether evidence is too remote to be admissible rests within the sound discretion of the trial court. *State v. Betts,* 214 Kan. 271, Syl. ¶ 2, 519 P.2d 655 (1974). Lapse of time may not be sufficient to deprive evidence of its value, *State v. Demming,* 79 Kan. 526, 528, 100 Pac. 285 (1909), but goes to the weight of the evidence, which is for the jury to determine. See *State v. Betts,* 214 Kan. at 276; 29 Am. Jur. 2d, Evidence § 360, p. 410.

The judgment of the lower court is affirmed.