No. 64,384

STATE OF KANSAS, *Appellee*, v. JOHN RICHARD (J.R.) CADY, *Appellant*.

(811 P.2d 1130)

Opinion filed May 24, 1991.

*Thomas Jacquinot*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Paul J. Morrison*, district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: John Richard (J.R.) Cady was convicted of first-degree murder. At the time of the murder Cady was a 16-year-old juvenile. The State's request that Cady be tried as an adult was granted by the district court. Cady appeals, claiming: (1) The district court erroneously allowed the State to prosecute him as an adult (K.S.A. 38-1636); (2) the district court erred by denying his request that the jury be instructed on diminished capacity; and (3) juror and prosecutorial misconduct violated his right to a fair trial.

At 12:15 p.m. on November 2, 1988, Cady gained entrance to 16-year-old Melissa Brown's house by asking Melissa's older sister to let him stay in the house so that he could talk to Melissa before he left to go to California. Melissa was Cady's former girlfriend. The older sister testified that before she left the house, Cady appeared normal to her and had assured her that nothing would happen to Melissa.

Melissa's stepfather arrived home after 4:30 p.m. Shortly thereafter, Melissa arrived and immediately went to her bedroom. The stepfather heard Melissa scream. When the stepfather entered Melissa's bedroom, he saw Cady standing with his arm around Melissa's neck and holding a knife at his side. The stepfather said Cady looked directly at him with a determined look. When the stepfather asked Cady what he was doing, Cady began stabbing Melissa in the chest with the hunting knife and said, "This is what the hell I'm here for." As the stepfather went to call the police, Cady left the house.

At about 5:00 p.m., Cady walked up to Rick Emery's house and asked if he could use the phone to call the police. Cady told Emery, in a normal voice, that he (Cady) had just stabbed and killed his girlfriend. Emery testified that while waiting for the police to arrive, Cady told the young adults at Emery's house that they should not follow in his footsteps. When Emery asked Cady if he just cut her, Cady replied, "No, I stabbed her and watched the life flow out of her." Cady stated, "I know what I did was wrong, but I had to do it, and I know that I'm probably going to the electric chair for this." Emery testified that while

Cady was using the phone he heard Cady say, "I killed her and I told you I was going to kill her, and I did it."

Detectives Roger T. LaRue and Joseph Pruett were dispatched to Emery's house. When LaRue and Pruett arrived at approximately 5:40 p.m., they observed a group of young adults in front of the house. Cady walked up to the law enforcement officers and stated, "I'm the guy you're looking for." LaRue said that Cady was cooperative when LaRue requested Cady to be quiet so he could be read his *Miranda* rights. Cady was arrested and taken to the police station by Pruett. A written waiver of Cady's rights was obtained at 5:52 p.m. Cady's videotaped confession lasted from 5:52 p.m. until 9:15 p.m. During the videotaped interview, Cady conversed with Pruett in a rational, responsive, and coherent manner.

After Cady's arrest, LaRue went to the scene of the crime. In Melissa's bedroom, LaRue found Cady's knife on the victim's bed, and, in her top dresser drawer, he found a leather-like sheath that appeared to fit Cady's knife.

James M. Beasley, a law enforcement officer whose son had grown up with Cady, testified that at about 5:00 p.m. on the day of the murder, Cady called him. In a normal conversational tone, Cady talked about running away to California. The conversation was interrupted when Cady suddenly hung up the phone. Beasley said that ten minutes after the first telephone conversation, he received a second phone call from Cady. During this conversation Cady's voice was very excited and high-pitched. Cady told Beasley he had just killed his girlfriend by stabbing her three times with a knife and asked Beasley to arrest him. Beasley testified that he talked with Cady the next morning at the Johnson County Detention Center. During this conversation Cady described the stabbing of Melissa and admitted that he knew it was wrong.

At the trial Dr. Lowell Ghosey, school administrator for Olathe North High School, testified about an incident that had happened in his office between Cady and Melissa the day before the stabbing. In that incident, Cady was so angry at Melissa that Dr. Ghosey told Melissa to go to another office. As Melissa left, Cady kicked a chair into her left leg. Cady then smashed the chair. As a result of his actions, Cady was expelled from school by Dr. Ghosey.

A police officer responding to a complaint received from the school as a result of Cady's actions testified that Melissa told him Cady had pushed her against a locker with his chest, grabbed her sweater with his hand and stated, "[Y]ou'll regret it, Melissa."

The stabbing of Melissa was not disputed by the defense. The defense claimed that Cady was not sane when he stabbed Melissa.

In the State's case in chief, several witnesses testified that Cady was normal before and after the murder. Testifying for Cady, Dr. Richard Sweetland stated he had diagnosed Cady as suffering from schizophrenia. Sweetland stated that Cady was psychotic and hallucinating when he stabbed Melissa Brown and could not comprehend the nature of his acts. Dr. Sweetland observed that Cady's schizophrenia was a developmental disease, directly related to a seriously disturbed childhood, that did not fully manifest itself until Cady "cracked" and killed the victim. Dr. Sweetland stated that Cady's personality was so disordered that even after undergoing extensive treatment, Cady probably would not be able to function as a normal and sane human being.

In rebuttal the State called Dr. Sheridan Tucker, a psychiatrist. Dr. Tucker agreed that Cady suffered from schizophrenia; however, he disagreed with Dr. Sweetland's finding that Cady did not understand the nature and the wrongfulness of his action when he stabbed Melissa. During Dr. Tucker's interviews with Cady, the doctor noted six instances of deception by Cady. Tucker noted that Cady has multiple antisocial traits. Tucker testified that, although schizophrenia is a progressive disease, Cady knew the difference between right and wrong at the time of the crime.

Cady first argues that the district court improperly allowed the State to prosecute him as an adult. Under K.S.A. 38-1636(f), the court may authorize prosecution as an adult of any person 16 years of age or more at the time of the commission of the alleged crime if there is substantial evidence that the respondent should be prosecuted as an adult for the offense charged. Subsection (e) of K.S.A. 38-1636 lists eight factors which the court must consider when determining whether to allow prosecution of the juvenile as an adult:

"(1) The seriousness of the alleged offense and whether the protection of the community requires prosecution as an adult; (2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful

manner; (3) whether the offense was against a person or against property, greater weight being given to offenses against persons, especially if personal injury resulted; (4) the number of alleged offenses unadjudicated and pending against the respondent; (5) the previous history of the respondent, including whether the respondent had been adjudicated a delinquent or miscreant under the Kansas juvenile code or a juvenile offender under this code and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence; (6) the sophistication or maturity of the respondent as determined by consideration of the respondent's home, environment, emotional attitude, pattern of living or desire to be treated as an adult; (7) whether there are facilities or programs available to the court which are likely to rehabilitate the respondent prior to the expiration of the court's jurisdiction under this code; and (8) whether the interests of the respondent or of the community would be better served by criminal prosecution. The insufficiency of evidence pertaining to any one or more of the factors listed in this subsection shall not in and of itself be determinative of the issue."

After hearing the evidence, the district court authorized criminal prosecution of Cady, stating:

"1) That John Richard Cady was over the age of 16 years at the time of the alleged charge, his correct date of birth being December 22, 1971.

"2) That John Richard Cady is charged with a Class A Felony under K.S.A. 21-3401, *i.e.* murder in the first degree by killing a human being maliciously, willfully, deliberately and with premeditation.

"3) That the charge is a serious allegation and the protection of the community requires prosecution as an adult.

"4) That the alleged offense was committed in an aggressive, violent, premeditated and willful manner against a person causing her death.

"5) That John Richard Cady has previously successfully completed a diversion contract for a charge of burglary and felony theft; however, there is only the one pending charge before the Court at this time.

"6) That while there is evidence before the Court that the respondent's psychological condition indicates a need for long term treatment in a structured setting, there is no evidence to indicate that the respondent is less mature than suitable to his chronological age.

"7) That there are no facilities or programs available to the Court which are likely to rehabilitate the respondent prior to the expiration of the Court's jurisdiction under the Kansas Juvenile Offender's Code.

"8) That the interests of John Richard Cady and the community would be best served by criminal prosecution given the nature of the charge, the limited time of jurisdiction, and the need for long term intensive, structured treatment necessary for the respondent.

"9) That there is substantial evidence that John Richard Cady should be prosecuted as an adult for the offense with which he is charged."

Cady argues that the district court, when authorizing Cady's prosecution as an adult, disregarded its protective role in the juvenile justice system and focused solely on the penal nature of the allegations against him. We disagree. There is substantial evidence to support the district court decision that Cady should have been prosecuted as an adult.

Cady next argues the trial judge erred by denying his request that the jury be instructed on diminished capacity.

The trial court instructed the jury on first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter, and that defendant could be found not guilty. Both psychiatric experts testified that Cady was schizophrenic. No expert testified that schizophrenia alone negated Cady's ability to premeditate his actions. Although the jury was also instructed on the defense of insanity, Cady requested the following instruction on diminished capacity:

"If you find there is evidence of an abnormal mental condition tending to prove either that the accused could not or did not entertain specific intent or state of mind essential to the offense, such evidence though not sufficient in itself to establish legal insanity, should be considered for the purpose of determining whether the crime charged, or a lesser degree thereof, was in fact committed."

The district court denied the request and refused to instruct the jury on diminished capacity.

Although the defense of diminished capacity had previously been rejected, in *State v. Dargatz*, 228 Kan. 322, 332, 614 P.2d 430 (1980), we noted that where the crime charged requires a specific intent, evidence of diminished capacity is admissible to show that the accused is incapable of forming the specific intent to commit the crime. In *State v. Jackson*, 238 Kan. 793, 798, 714 P.2d 1368, *cert. denied* 479 U.S. 821 (1986), we stated that the decision on whether to instruct the jury on diminished capacity lies within the district court's discretion. See *State v. Pioletti*, 246 Kan. 49, 59, 785 P.2d 963 (1990); *State v. Morris*, 244 Kan. 22, 765 P.2d 1120 (1988); and *State v. Maas*, 242 Kan. 44, 744 P.2d 1222 (1987).

Citing *United States v. Lofton*, 776 F.2d 918 (10th Cir. 1985), as authority, Cady urges us to overrule our prior cases which allow the district court discretion on whether to instruct the jury

on diminished capacity. Cady argues that the failure to give the instruction deprived him of the opportunity to present his defense to the jury and violated his right to due process guaranteed by the United States Constitution.

We disagree. Cady was not deprived of his right to present his claim of diminished capacity to the jury. He presented the testimony of his expert witness and had the opportunity to cross-examine the State's witnesses. The defendant was not restricted in his closing argument to the jury. Cady merely failed to convince the jury of his diminished capacity.

There is nothing in the record to indicate that Cady's counsel objected to the trial court's ruling denying his request for an instruction on diminished capacity. No party may assign as error the giving or failure to give an instruction unless the party objects thereto before the jury retires to consider the verdict, stating distinctly the matter to which the party objects and the ground of the objection, unless the instruction is clearly erroneous. K.S.A. 22-3414(3). Regardless of the lack of objection, the failure to give the instruction was not erroneous under any standard of review. There is sufficient evidence that Cady methodically planned the murder of his girlfriend.

The final issue for our consideration is Cady's contention that juror and prosecutorial misconduct violated his right to a fair trial.

Cady's trial commenced on a Monday. The record shows that after the jury had been selected and sworn, the trial court instructed the jurors:

"Please keep an open and attentive mind throughout the trial. Do not make up your mind or attempt to reach any decision until the conclusion of the entire case and its submission to you for deliberation. Prior to the final chapter of this case, you are not to voice any opinions as to what your position is in reference to any of the evidence that you have heard. Prior to the conclusion of this case, you are not to discuss this matter amongst yourselves or with anyone else, nor are you to allow anyone to discuss it in your presence. If you have any problems along those lines, please call it to my attention or Miss Paulsen's."

Cady claims that on the second day of the trial at around 3:00 p.m. while the State was still presenting its case, one of the jurors during a recess stated, "That son-of-a-bitch [Cady] is guilty

as hell." The remark was overheard by Lt. Pruett, formerly Detective Pruett, while he was in a stall of the men's restroom, across the hall from the courtroom.

Lieutenant Pruett immediately informed the prosecutors he thought one of the jurors, Leroy Sweat, had made the statement. One of the prosecutors informed Lt. Pruett that if the information was correct, it would require a mistrial. Lt. Pruett made no further statement, the prosecutors did nothing, and the trial proceeded. On Wednesday both the State and the defense rested. The jury was instructed and began its deliberation.

On Thursday morning the prosecutors informed the district attorney, who had been out of town, about the information they had received from Lt. Pruett. Prior to the jury commencing its deliberation that day, the district attorney and the prosecuting attorneys went to the trial judge's chambers and informed the judge what Lt. Pruett had overheard. After this conversation, the trial judge allowed the jury to continue its deliberation. Without informing the defendant's attorney of his conversation with the prosecutors, the trial judge asked if either party objected to his dismissing the alternate jurors. The defendant's attorney, who had no knowledge of what had transpired, agreed that the alternate jurors could be dismissed from service. After the jury found Cady guilty of murder in the first degree and had been excused from further service, the judge stated: "[P]rior to leaving here today, it is absolutely necessary that I see both counsel for the State and counsel for defense in my chambers. I think most of us or some of us know what that's about."

After the trial judge called counsel into his chambers, he informed Cady's attorney what had transpired. Cady's appellate counsel agrees the record is unclear and the trial judge may have been under the impression that the State's attorneys had informed defense counsel about the statement attributed to the juror, prior to the judge's request to release the alternate jurors.

The same judge who had presided at Cady's trial conducted the hearing on Cady's motion for a new trial. The motion for new trial was based on alleged juror and prosecutorial misconduct stemming from the comment Lt. Pruett had overheard during the trial. At the conclusion of the hearing, the judge merely stated:

"The Court, after reading the law in reference to this matter—I assume that we'd all spent some time in reference thereto—finds that under the statements as made and evidence that I heard, the Court finds that the Motion for New Trial should be and the same is hereby denied."

Cady argues that because the district court failed to make specific findings or conclusions of law, the appellate court should conclude from the record that the defense proved, by a preponderance of the evidence, a sworn juror during the course of the trial stated to someone that he believed Cady was guilty. The State does not dispute the fact the statement was made but claims there is no evidence to prove that the statement overheard in the men's restroom was made by a juror.

Lieutenant Pruett testified at the new trial hearing that in his opinion the remark was made by a juror named John L. (Leroy) Sweat. Pruett said that Sweat was his butcher and had been his personal friend for the last four years. He testified that he talked to Sweat at least once a week and knew him by the name of Leroy. On cross-examination by one of the attorneys who prosecuted during the trial, the following occurred:

"BY MR. WATSON:

"Q. Detective, you can't say for sure that was Leroy Sweat, can you?

"A. No, sir.

"Q. In fact, sir, when you told Mr. Fritz and myself, isn't it a fact you came out and said, 'Well, it sounds to me like you have at least somebody in your corner. I heard somebody say'—and basically paraphrasing this statement; is that correct?

"A. That's not what I recall saying.

"Q. What did you say?

"A. I told you that I thought Leroy Sweat had said that.

"Q. Did you give us the name Sweat when you said that?

"A. Yes — yes.

"Q. Did you in fact tell us that you thought it was a juror?

"A. We had discussed the fact that Leroy was on the jury. When I said Leroy, I was implying that it was a juror.

"Q. In fact, did I not say to you that if I know this is a juror I have to report this to the Court, and that's a mistrial; is that right?

"A. That's correct, sir.

"Q. And you did not respond to me when I said that?

"A. There was no verbal response.

"Q. You assumed there was a second person in there. Is that based upon the shuffling sounds, or the fact you felt the presence of a second person in there?

"A. I could see a second person in there.

"Q. A second set of legs or something to that effect?

"A. Yes.

"Q. You assumed that was a male, then, based upon the dress and the fact it was in the men's restroom?

"A. Somebody was standing at the urinal.

"Q. And you have no idea who that other person was?

"A. No, sir.

"Q. And there was no other comment made that you heard?

"A. None."

Then the court asked Lt. Pruett the following:

"THE COURT: And as I understand it, sir, to be sure, you cannot say positively that it was Leroy Sweat; is that correct? I believe that was the question asked you by the defense.

"MR. PRUETT: No, Your Honor. If I could expound for just a minute.

"THE COURT: Certainly.

"MR. PRUETT: I was in the restroom, and there was no one else present. The door was closed to the stall. Two gentlemen came in, the comment was made, they left, then I came out of the stall. I never saw who it was, other than to tell you it was two gentlemen.

"THE COURT: Thank you. Any questions?

"MR. HEDRICK: No, Your Honor.

"THE COURT: Thank you very much, Officer. We appreciate it, and we appreciate your information.

"Defendant's next witness.

"MR. HEDRICK: Judge, I don't have any more witnesses."

The prosecutor then called his co-counsel to testify about the conversation in which Lt. Pruett informed the prosecutors of what he had overheard in the restroom:

"Q. And do you [Mr. Fritz] recall the nature of that conversation?

"A. Yes, sir.

"Q. Sir, do you recall from your recollection when Detective Pruett approached the prosecution for the State, do you recall whether or not he identified this unknown speaker by last name?

"A. No, sir, he did not."

Then Cady's attorney cross-examined the prosecutor regarding his knowledge as to the juror's identity:

"BY MR. HEDRICK:

"Q. Mr. Fritz, during voir dire, you are aware that one of the jurors indicated that he knew Detective Pruett; isn't that correct?

MR. WATSON: Judge, that's outside the scope.

THE COURT: It is, but I'm going to allow it.

THE WITNESS: Could you restate that, please?

"Q. (By Mr. Hedrick) You were aware that one of the jurors knew Detective Pruett personally; is that right?

"A. Yes.

"Q. Did you make notes in your record as to what juror that was?

"A. I believe I did.

"Q. Do you know who that was?

"A. Do I know now who it was?

"Q. Uh-huh.

"A. Yes, it was Leroy Sweat.

"Q. So if he were to give you the name of Leroy and indicate to you that some communication occurred, wouldn't it be natural for you to assume Leroy Sweat was the person he was talking about?

"A. I know now that if he mentioned the name Leroy it probably could have been Leroy Sweat.

"Q. You're saying he didn't mention the last name at that point in time?

"A. No, he did not.

"Q. And at that point in time, you didn't have any idea he was talking about a juror?

"A. No.

"Q. Did he make any other statements to you, such as, 'It looks like you have someone in your camp,' or something to that effect?

"A. Yes, he did.

"Q. Did that lead you to believe that it was a juror?

"A. No.

"Q. What did that lead you to believe?

"A. Well, if I may explain, we were talking—he asked us how our case was going, and I remember stating to Mr. Pruett that we got in evidence that we thought was good, and we felt it was going very well, and Mr. Pruett stated at that point that there was somebody in our camp. So I don't know if that was a spectator that made an opinion that our case was going well. In fact, that's what I believed at that time.

"Q. You believed it was a spectator?

"A. Yes."

Lieutenant Pruett was recalled as a witness for Cady and testified as follows:

"Q. (By Mr. Hedrick) Did you inform them as to the identity of the person who you believed made the statement?

"A. Yes, sir.

"Q. And how did you identify him to them?

"A. I told them that it was Leroy, the juror.

"Q. Leroy the juror?

"A. Right.

"Q. You did make the statement that it was a juror then?

"A. Yes."

Then, on cross-examination by the State, Lt. Pruett stated the following occurred:

"Q. When you testified earlier, you stated for a fact that you didn't know that it was a juror, correct?

"A. That's correct.

"Q. And you testified before that you said it was the name 'Leroy'; you thought you'd said the word 'Sweat.' Mr. Fritz has testified that you never said any last name, just the word 'Leroy.' Now you've added the appellation of 'juror' onto the word 'Leroy'; is that correct?

"A. That is correct.

"Q. And it's your recollection that you said, in fact, it was a juror; is that correct?

"A. What I indicated to you and Mr. Fritz in the hallway at the end of the conversation I overheard was that I had heard Leroy say, 'That son of a bitch is guilty as hell.'

"Q. You thought it was Leroy?

"A. I—I did.

"Q. Based upon the voice, correct?

"A. Correct.

"Q. And based upon what you've just said there, you never said, 'Leroy, the juror, said he's guilty as hell,' correct? What I'm getting at, sir, and you have to understand that this is an issue that is being taken down exactly as you say it.

"A. That is correct.

"Q. The phrase, 'the juror.' Did you enunciate that phrase and speak that phrase, 'the juror,' to Mr. Fritz and myself?

"A. Not that I can recall specifically, no, sir.

"Q. Okay. You said the word Leroy, correct?

"A. I did."

At the hearing on the motion for new trial based on Lt. Pruett's testimony that he thought Leroy had made this statement, the defense's entire argument was based on the assumption that a juror may have made the statement.

In essence, the right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. A juror's verdict must be based upon the evidence developed at the trial of a criminal prosecution, regardless of the heinousness of the crime charged, the apparent guilt of the offender, or the station in life which the offender occupies.

Although it is the theory of the law that a juror who has formed an opinion before he or she is sworn cannot be impartial, the Fourteenth Amendment's guaranty of due process does not require that a prospective juror be totally ignorant of the facts and issues involved in the case, and the mere existence on his or her part of a preconceived notion as to the guilt or innocence of the accused is, without more, insufficient to rebut the presumption of impartiality if he or she can lay aside an impression or opinion and render a verdict based on the evidence presented in court.

Whether a defendant is denied due process of law because of prejudice by the jury is tested by the question whether the nature and strength of the opinion formed are such as in law necessarily raise the presumption of partiality, and this question is one of mixed law and fact. The affirmative of the issue is upon the challenger. The juror need not necessarily be set aside unless the challenger shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, but if a positive and decided opinion has been formed by the juror, he or she will be incompetent even if the opinion has not been expressed. *Irvin v. Dowd*, 366 U.S. 717, 722-23, 6 L. Ed. 2d 751, 81 S. Ct. 1639 (1961).

Cady argues the lack of impartiality by a trier of fact is a fundamental error which requires automatic reversal. *Rose v. Clark*, 478 U.S. 570, 577, 92 L. Ed. 2d 460, 106 S. Ct. 3101 (1986); *Tumey v. Ohio*, 273 U.S. 510, 71 L. Ed. 749, 47 S. Ct. 437 (1927). Though Cady's counsel talked to Mr. Sweat about the incident, he did not subpoena the juror to testify. Cady claims that the fact that a juror, sworn to be impartial, made the remark is sufficient to show that he was not tried by an impartial jury. Cady argues that under the circumstances, the verdict against him lacks the basic integrity required by law.

The procedure to question the validity of a jury verdict is statutory. Upon an inquiry as to the validity of a verdict no evidence shall be received to show the effect of any statement, conduct, event, or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or concerning the mental processes by which the verdict was determined. K.S.A. 60-441. This statute is not construed to exempt a juror from testifying as a witness to conditions or occurrences

either within or outside of the jury room having a material bearing on the validity of the verdict. K.S.A. 60-444(a). Jurors may be recalled for post-trial motions by order of the court after a hearing on a request to recall the jury. The burden is upon the party seeking an order to recall the jurors to show the necessity for the order. *State v. Ruebke*, 240 Kan. 493, 512-13, 731 P.2d. 842, *cert. denied* 483 U.S. 1024 (1987).

Juror misconduct in civil and criminal cases is not a ground for reversal, new trial, or mistrial unless it is shown to have substantially prejudiced a party's rights. The party claiming prejudice has the burden of proof. *State v. Fenton*, 228 Kan. 658, 664, 620 P.2d 813 (1980). The defendant in *Fenton* was told by a juror that jurors had heard a threat that the defendant would kill the jurors if he was convicted and argued that the trial court erred in not granting him a new trial. Three jurors had heard about the threat prior to the jury's deliberation and considered the threat a mere rumor that did not affect the jury's deliberation. 228 Kan. at 663. The *Fenton* court was satisfied that the trial court did not abuse its discretion in finding the defendant had failed to show substantial prejudice to his rights.

Juror misconduct was reviewed in *State v. Allen*, 4 Kan. App. 2d 534, 609 P.2d 219, *rev. denied* 228 Kan. 807 (1980). In *Allen*, the jury foreman spoke to three different people about the trial while the case was in progress. During a recess, the juror told one person, "[I]t just looks to me like the man is guilty." 4 Kan. App. 2d at 537. Another person testified the juror told him that after hearing the defendant's confession he could not go along with insanity as a defense or with the psychiatrist's report. In addition, the juror told a third person, prior to hearing the psychiatric testimony, that he was going to vote guilty. 4 Kan. App. 2d at 536. When questioned, the juror testified that none of the three people he spoke to had tried to influence his opinion nor did he tell anyone how he was going to vote. The Court of Appeals found that although the juror conduct was improper, it did not justify or require a new trial. 4 Kan. App. 2d at 537. The Court of Appeals noted that the juror had made his statements to the various individuals based on the evidence adduced at trial. It found that the trial court did not abuse its discretion in denying the defendant's motion for a new trial.

Not every violation of the rule that jurors must refrain from forming or expressing opinions about the case until the case is submitted to the jury for deliberation is such prejudicial misconduct that it requires a new trial. Nonetheless, trial courts cannot ignore basic principles of proper jury conduct required by law. Under the facts of this case, however, we need not determine whether a juror's preconceived or premature notion of guilt violated the oath of impartiality and the Fourteenth Amendment's guaranty of due process. The State's failure to immediately report to the court and to Cady's counsel the possibility of a juror's misconduct casts dark shadows upon the Fourteenth Amendment's guaranty of due process and the fundamental right to a fair trial. There may be confusion as to the actual conversation between Lt. Pruett and the prosecutors, but it is clear that the name John L. Sweat appeared on the juror forms. The prosecutors knew that one of the jurors had indicated that he knew Lt. Pruett. One of the prosecutors, Mr. Fritz, noted in his trial notes that "Leroy Sweat" personally knew Lt. Pruett.

In its brief to this court, the State neither disputes the defendant's statement of the prosecutors' actions during the trial nor briefs the issue of prosecutorial misconduct. Cady points out if the prosecutors had doubts about whether the remarks had originated from a juror, they had an ethical obligation to report the incident to the judge and to Cady's attorney.

"Although the prosecuting attorney's paramount obligation is to the public, it is not enough to be intent on the prosecution of the case; the prosecutor must never lose sight of the fact that a defendant, as an integral member of the body politic, is entitled to a full measure of fairness. Put another way, the prosecutor's mission is not so much to convict as it is to achieve a just result. Although the accused must be prosecuted with earnestness and vigor, the prosecutor must always be faithful to the state's overriding interest that justice be done; the prosecuting attorney is the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. It is as much the prosecutor's duty to see that a person on trial is not deprived of any of his statutory or constitutional rights as it is to prosecute the defendant. Nonetheless, zeal in the prosecution of criminal cases is to be commended and not condemned. If convinced of the defendant's guilt, the prosecuting attorney should, in an honorable way, use every available power to secure the defendant's conviction. At the same time, it is the prosecutor's duty to remain under appropriate restraint and avoid violent partisanship, partiality, and misconduct which may tend to deprive

the defendant of the fair trial to which he is entitled, and it is as much a prosecutor's duty to refrain from improper methods calculated to bring about a wrongful conviction as it is to use every legitimate means to bring about a just one.

"After conviction, the prosecuting attorney is bound by the ethics of the office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction." 63A Am. Jur. 2d, Prosecuting Attorneys § 26.

Prior to March 1, 1988, the prosecutors' conduct would have fallen within the guidelines of the Code of Professional Responsibility, DR 7-108(G) (1990 Kan. Ct. R. Annot. 198-99), which stated:

"A lawyer shall reveal promptly to the court improper conduct by a venireman or a juror, or by another toward a venireman or a juror, or a member of his family, of which the lawyer has knowledge."

After March 1, 1988, all ethical violations have been subject to the Model Rules of Professional Conduct.

MRPC 3.5(c) (1990 Kan. Ct. R. Annot. 264) states:

"A lawyer shall not:

. . . .

"(c) communicate or cause another to communicate as to the merits of a cause with a judge or official before whom an adversary proceeding is pending except:
"(1) in the course of official proceedings in the cause;
"(2) in writing, if the lawyer promptly delivers a copy of the writing to opposing counsel or to the adverse party if unrepresented;
"(3) orally upon adequate notice to opposing counsel or the adverse party if unrepresented;
"(4) as otherwise authorized by law or court rule."

Not every trial error or infirmity which might call for application of an appellate court's supervisory powers correspondingly constitutes a failure to observe that fundamental fairness that is essential to the very concept of justice. *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 40 L. Ed. 2d 431, 94 S. Ct. 1868 (1974).

The prosecutor, although possessing wide discretion, is not immune from judicial review of the exercise of that discretion for arbitrariness. *State v. Greenlee*, 228 Kan. 712, 721, 620 P.2d 1132 (1980). Absent substantial prejudice to the rights of the defendant, there must be a showing of bad faith on the part of the prosecutor before relief may be granted as a result of the prosecutor's delay in reporting possible juror misconduct to the

court and defense counsel. Without affirmative evidence by the defense that the prosecutor's conduct was intentional or that it violated defendant's constitutional right to a fair trial, there can be no reversible error.

When specific guarantees of the Bill of Rights are involved, courts must take special care to ensure that prosecutorial conduct in no way impermissibly infringes upon them. In this case, the prosecuting attorneys, by not immediately reporting the possibility of a juror's misconduct to the trial judge and by not informing opposing counsel of the possible misconduct, violated the Model Rules of Professional Conduct. The prosecutor's delay in reporting possible juror misconduct to the court and to defense counsel is evidence of bad faith which violated defendant's constitutional right to a fair trial. If the prosecution had immediately reported the incident to the trial judge, the judge could have taken remedial action prior to discharging the alternate jurors.

Although not an issue raised by the parties, the defendant in a felony case is entitled to be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by law. K.S.A. 22-3405. Neither Cady nor his counsel were aware that the State and the trial judge were conferring about the possibility of a juror's misconduct.

There is no doubt that there was substantial prejudice to the rights of the defendant and he must be granted a new trial.

Reversed and remanded for a new trial.

HOLMES, C.J., and McFARLAND, J., dissenting.