No. 67,241

THE PEOPLES BANK OF PRATT, as Conservator of the Estates of Jon R. Grossman and Ryan K. Grossman, children and heirs at law of Richard J. Grossman; and KAREN S. GROSSMAN, as an heir at law of Richard J. Grossman, *Appellees/Cross-appellants*, v. INTEGRAL INSURANCE COMPANY and SOUTHWEST TRANSPORTATION, INC., *Appellants/Cross-appellees*.

(840 P.2d 503)

Opinion
filed October 30, 1992.

*Kenneth L. Weltz,* of Curfman, Harris, Rose & Weltz, of Wichita, argued the cause, and *Craig A. Kreiser,* of the same firm, was with him on the briefs for appellants/cross-appellees.

*Albert L. Kamas,* of Render, Kamas & Hammond, of Wichita, argued the cause and was on the brief for appellees/cross-appellants.

The opinion of the court was delivered by

McFARLAND, J.: This is a wrongful death action brought on behalf of the estate and heirs of Richard Grossman. The jury assessed 70 percent of the fault against defendants and 30 percent against the deceased. The defendants appealed and the plaintiffs filed a cross-appeal.

The facts may be summarized as follows. On June 29, 1989, Grossman was moving some of his cattle from one pasture to another. He was accompanied by his 13-year-old son, Jon. The cattle were being transported in a stock trailer pulled by a flatbed truck. The first load of cattle was moved without incident. The route utilized involved driving south to U.S. 54, east 1½ miles to a county road intersection, and north to the home farm. On the second trip, as the truck and trailer were turning onto the county road, a collision occurred between the Grossman truck and a truck owned by defendant Southwest Transport, Inc. (Southwest), which was insured by defendant Integral Insurance Company. The Southwest truck was attempting to pass the Grossman vehicle at the time of the collision.

Grossman was thrown from his vehicle by the impact. The gas tank on his truck was severed and thrown a few feet from the vehicle. The tank ignited. Grossman apparently rolled through the flames and his clothing caught fire. He was badly burned and died three days later. Other facts will be stated as necessary to the discussion of particular issues.

## GRANTING OF A NEW TRIAL
## AFTER FIRST JURY VERDICT

This case was tried twice. The first trial resulted in a jury verdict assessing 50 percent of the fault to the decedent and 50 percent to Southwest. After the verdict, a motion for new trial was filed by the plaintiffs, alleging juror misconduct. Specifically, it was claimed that one juror, LaDonna Chase, had made statements during this trial that she had made up her mind. There was some conflict in the jurors' affidavits as to exactly what Chase said and when the statements were made. In granting the new trial, the trial court stated:

"I am sustaining the plaintiff's Motion for a New Trial because [of] the misconduct of the juror, LaDonna D. Chase. If her comments, obvious bias, and mind set had been brought to my attention during the course of the trial (and I'm not sure I understand why it wasn't), I would have declared a mistrial without hesitation.

"If it was error at that time to have caused a mistrial, it is error now not to grant a new trial. I am not certain, and no one will ever know, how much she tainted the minds of the other jurors, but it was gross misconduct, and cannot be tolerated. The plaintiffs are entitled to have their case tried before a completely fair and impartial jury, and this did not happen."

Defendants claim, in their first issue, that this was an abuse of judicial discretion.

K.S.A. 60-259 provides, in pertinent part:

"(a) *Grounds.* A new trial may be granted to all or any of the parties and on all or part of the issues when it appears that the rights of the party are substantially affected:

*First.* Because of abuse of discretion of the court, misconduct of the jury or party, or accident or surprise which ordinary prudence could not have guarded against, or for any other cause whereby the party was not afforded a reasonable opportunity to present his evidence and be heard on the merits of the case."

The statutory grounds for a new trial were discussed in *Sulkis v. Zane,* 208 Kan. 800, Syl. ¶ 1, 494 P.2d 1233 (1972), wherein we held:

"Where one of the grounds specified in K.S.A. 60-259 . . . is shown to exist, the granting of a new trial rests in the sound discretion of the trial court and an order granting or refusing a new trial will not be reversed on appeal unless a clear abuse of discretion is shown."

Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that

discretion is abused only when no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *In re J.W.S.*, 250 Kan. 65, Syl. ¶ 6, 825 P.2d 125 (1992).

We find no abuse of discretion in the trial court's granting of a new trial following the first trial herein.

## DENIAL OF A NEW TRIAL AFTER THE SECOND JURY VERDICT

For their second issue, defendants contend the trial court abused its judicial discretion in denying their motion for a new trial following the verdict in the second trial herein. The motion was based on juror misconduct.

The facts pertinent to this issue need to be set forth in some detail. Plaintiffs were represented by Al Kamas of Wichita and Black's Law Office of Pratt. Tom and John Black were attorneys in Black's Law Office. During voir dire, the question was asked of the 12 seated prospective jurors if there was "anything about your relationship with Tom Black" that would lead them to favor the plaintiffs over the defendants. There was no response. One of the 12 persons seated was Russell Kilgariff. Kilgariff had filed a juror questionnaire indicating he had been a party to a civil lawsuit in Hutchinson. Kamas asked Kilgariff if that experience would affect Kilgariff's judgment in the present case. Kilgariff replied, "Probably not." Kamas then asked Kilgariff if he would make Kamas work harder than defense counsel to prove his case. Kilgariff replied everyone would have to work hard. Later, the following exchange occurred between defendant's attorney, Ken Weltz, and Kilgariff:

"Mr. Kilgariff, Mr. Kamas asked you if you'd make me work as hard as him and you said you'd make everybody work hard. Do you understand that Mr. Kamas has the burden of proof?

"RUSSELL KILGARIFF: Uh-huh.

"MR. WELTZ: He has to prove that his case is more true than not true, will you make him do that?

"RUSSELL KILGARIFF: Yeah.

"MR. WELTZ: If he doesn't do that will you be able to give a defense verdict and say I'm not giving anybody any money?

"RUSSELL KILGARIFF: If it's proven, yeah."

Kilgariff was sworn in as a juror. He served as the presiding juror during the jury's deliberations. After the trial, defense counsel learned that Kilgariff's prior action was in Pratt, not Hutchinson, and that Black's Law Office was Kilgariff's counsel therein. The representation continued through the trial herein. The action involved was a foreclosure action against Kilgariff. The relationship between Kilgariff and Black's Law Office was not revealed to the court or opposing counsel by Kilgariff or plaintiffs' counsel.

At the post-trial hearing on the motion for a new trial, some jurors were called to testify. Some testified they saw no predisposition in favor of plaintiffs on the part of presiding juror Kilgariff. One juror, Evelyn Simonson, stated Kilgariff was opinionated in favor of plaintiffs. She favored a 50/50 verdict, and stated Kilgariff "just wouldn't even listen to me, . . . he was definite."

From Kilgariff's answers to questions, it is apparent that the foreclosure action was a significant event in his life. As he put it, the foreclosure action was part of the reason he was working for an oil company instead of operating his own oil company as he had done previously.

After hearing the evidence, the trial judge overruled the motion, stating:

"Regarding the allegations of misconduct by the juror, Russell Kilgariff, the Court would make the following factual findings: first of all, the juror Kilgariff was an active client of the Black's Law Firm, P.A., at all relevant times regarding this case; and the Court would further find that John V. Black and Thomas V. Black both materially participated in this trial and in preparation for this trial. Third, that the juror Kilgariff failed to disclose that he—on his questionnaire, that he was involved in litigation here in Pratt; and further, he failed to disclose that during the questioning on the voir dire. The questioning on the voir dire speaks for itself and I won't get into an analysis of that and if the Appellate Court looks at that they can decide for themselves the matter of that questioning. The Court would further find that plaintiffs' counsel knew that the Mr. Kilgariff was an active client of the Black's Law Firm, but failed to disclose that information to the Court or opposing counsel. The Court would have struck Mr. Kilgariff for cause if the Court had been aware of the present representation; and I might comment there that my standard has always been, and when I've visited with other trial judges in a rural area, that the question of whether or not to strike somebody for cause on the basis of their having done legal work with a juror involved in that particular lawsuit basically comes down if there

is something presently going on that you would strike that particular juror, but if at some previous time, fairly remote in time, the attorney had done some work for that individual that that does not constitute grounds to strike for cause unless on voir dire the juror would make some particular statement that it would affect their judgment, which the issue never came up in this matter, because the question was never asked. The Court's interviews with Mr. Kilgariff and the four other jurors that have been interviewed to date fails to disclose any type of prejudice to the defendant in this case on the basis of Mr. Kilgariff having served as a juror in the case. I've asked very direct questions of the jurors on that particular point and they have been unanimous in indicating they thought Mr. Kilgariff was very objective in the matter both as an individual and as the presiding juror in the case and that they did not feel there was any prejudice and did not notice anything in the way he conducted himself and Mr. Kilgariff specifically denied that there was any type of favoritism for or prejudice against any of the parties to this lawsuit. In the absence of actual prejudice, the Court would not allow a post-verdict attack on the qualifications of a juror and the motion for a new trial on the basis that Mr. Kilgariff should not have been a juror in this case would be denied."

The rules relative to appellate review of a claim of abuse of judicial discretion are set forth in the preceding issue. Applying those rules to the facts herein, we conclude abuse of judicial discretion has been shown.

In *Kerby v. Hiesterman*, 162 Kan. 490, Syl. ¶ 3, 178 P.2d 194 (1947), we held:

"When a prospective juror, on *voir dire* examination, gives a false or deceptive answer to a question pertaining to his qualifications with result that counsel is deprived of further opportunity to determine whether the juror is impartial, and the juror is accepted, a party deceived thereby is entitled to a new trial even if the juror's possible prejudice is not shown to have caused an unjust verdict."

See *Walker v. Holiday Lanes*, 196 Kan. 513, 517-18, 413 P.2d 63 (1966).

In *State v. Cady*, 248 Kan. 743, 811 P.2d 1130 (1991), a juror was overheard by a police officer to remark, on the second day of a murder trial, "That son-of-a-bitch [Cady] is guilty as hell." The police officer relayed this information to one of the prosecutors. The prosecutors advised neither the court nor defense counsel. We reversed and remanded for a new trial, stating:

"In this case, the prosecuting attorneys, by not immediately reporting the possibility of a juror's misconduct to the trial judge and by not informing opposing counsel of the possible misconduct, violated the Model Rules of

Professional Conduct. The prosecutor's delay in reporting possible juror misconduct to the court and to defense counsel is evidence of bad faith which violated defendant's constitutional right to a fair trial." 248 Kan. at 759.

Kilgariff gave incorrect information on the juror questionnaire. Plaintiffs' counsel had a duty to disclose the fact Black's Law Office was actively representing Kilgariff. As the trial court stated, had it been aware of the true facts during voir dire, it would have struck Kilgariff for cause. Contrary to the trial court's rationale, actual prejudice need not be shown herein.

The public's confidence in the jury system is a very important factor to consider. In *Kerby v. Hiesterman,* 162 Kan. at 498, we quoted extensively with approval *Drury v. Franke,* 247 Ky. 758, 797, 57 S.W.2d 969 (1933), the following portion of which is reproduced:

" '[I]t is highly important that the conflicting rights of individuals should be adjudged by jurors as impartial as the lot of humanity will admit; next to securing a fair and impartial trial for parties, it is important that they should feel that they have had such a trial, and anything that tends to impair their belief in this respect must seriously diminish their confidence and that of the public generally in the ability of the state to provide impartial tribunals for dispensing justice between its subjects; the fact that the false information was unintentional, and that there was no bad faith, does not affect the question, as the harm lies in the falsity of the information, regardless of the knowledge of its falsity on the part of the informant.' "

Additionally, in this case there were two trials. In the first trial a 50/50 finding of fault was made, a verdict favorable to the defendants. In the second trial, an unfavorable verdict to the defendants was entered—70 percent of the fault was assessed to the defendants. In the second trial, it was subsequently discovered by defendants that the presiding juror was being actively represented by plaintiffs' counsel. The appearance of impropriety and unfairness directly affecting the verdict is heightened by these facts.

We conclude that the trial court's denial of defendant's motion for a new trial constitutes an abuse of judicial discretion. The judgment must be reversed and the case remanded for a new trial.

By virtue of the fact that the remaining issues in the defendants' brief will arise upon retrial, determination thereof is necessary.

## LOVE OF LIFE OR PRESUMPTION OF
## DUE CARE INSTRUCTION

For their third issue, defendants contend it was error for the trial court to have given a "love of life" instruction. Contemporaneous objection to the instruction was made. The instruction given was No. 11, which provides:

"Because of instincts of self-preservation and love of life, it is presumed that Richard Grossman at the time of the collision was exercising ordinary care to avoid injury. This presumption is overcome if you are persuaded by the evidence that the contrary was true."

Defendants argue that such instruction is proper only where determination of fault rested upon circumstantial evidence. They further argue that such instruction results in giving the deceased Grossman a presumption of exercising ordinary care which he would not have had if he had survived. We agree.

In *Pape v. Kansas Power & Light Co.*, 231 Kan. 441, 647 P.2d 320 (1982), we held the following relative to the giving of a love of life instruction:

"The submission of the instruction in this case was proper, since there were no eyewitnesses to the incident and plaintiffs' case was necessarily based on circumstantial evidence. The rule in Kansas is that, in a wrongful death action where there are no known eyewitnesses and plaintiff's action is based on circumstantial evidence, a trial court may in its discretion submit an instruction on the presumption of due care of a decedent. See *Akin v. Estate of Hill*, 201 Kan. 306, 309, 440 P.2d 585 (1968); PIK Civ. 2d 2.70 (1977)." 231 Kan. at 444.

In the case at hand, three eyewitnesses survived and testified herein: decedent's son Jon (called by plaintiffs and a plaintiff himself); Southwest's driver, John Seyler; and Southwest's trainee driver, Anthony Williams. The theory of the defense was that decedent Grossman negligently turned into the passing Southwest truck without giving an appropriate signal. Defendants argue that the presumption of due care instruction improperly shifted the plaintiffs' burden of proof to them.

We conclude the giving of the instruction was error by virtue of the eyewitness testimony herein. The trial court's discretion to give or not give the instruction referred to in *Pape v. Kansas Power & Light Co.*, 231 Kan. 441, is limited to situations where only circumstantial evidence is present in a wrongful death action.

## INSTRUCTION ON PASSING AT AN UNMARKED INTERSECTION

For their fourth issue, defendants contend it was error for the trial court to have given, over their objection, Instruction No. 18, which provides:

"The laws of Kansas provide that on any state or county maintained highway located outside the city limits a vehicle may pass another vehicle on the left side of the highway when approaching an unmarked intersection when such move can be made with reasonable safety."

Defendants argue that the law of Kansas places no special duty on drivers passing vehicles at unmarked highway intersections. They call our attention to K.S.A. 8-1519, reproduced in pertinent part, as follows:

"(a) No vehicle shall be driven on the left side of the roadway under the following conditions:

. . . .

(2) when approaching within 100 feet of or traversing any intersection or railroad grade crossing, *except that this section shall not apply to any intersection on a state or county maintained highway located outside city limits unless such intersection is marked by an official department of transportation or county road department traffic control device or pavement marking or both indicating that passing is prohibited and such marking is placed at least 100 feet before the intersection.*" (Emphasis supplied.)

It is undisputed that the exception set forth in K.S.A. 8-1519 is applicable herein.

Defendants argue that the giving of an instruction specifically on passing at an unmarked intersection only when such move can be made with reasonable safety implies that some greater duty of care existed where an unmarked intersection is involved, when the law of Kansas imposes no such duty.

Defendants call our attention to PIK Civ. 2d 8.16(c) (1992 Supp.), which provides:

"The laws of Kansas provide that no vehicle shall be driven to the left side of the roadway under the following conditions: (1) when approaching or upon the crest of a grade or a curve in the highway where the driver's view is obstructed within such distance as to create a hazard in the event another vehicle might approach from the opposite direction; (2) when approaching within 100 feet of or traversing any intersection or railroad-grade crossing; (3) when the view is obstructed upon approaching with 100 feet of any bridge, viaduct or tunnel. (The foregoing limitations do not apply on a one-way roadway.)"

and the note following its use, which provides:

"Part c(2) does not apply to any intersection on a state or county maintained highway located outside city limits unless the intersection is marked by an official department of transportation or county road department traffic control device or pavement markings or both indicating that passing is prohibited and such marking is placed at least 100 feet before the intersection."

In addition to the instruction in question, the trial court instructed the jury that standards of ordinary care apply to persons who use the highways; that a driver on a highway had a duty to use ordinary care to keep his vehicle under control and to drive within the range of his vision so that his vehicle could avoid a collision with another vehicle; that a driver on a public highway had a duty to maintain a proper lookout for vehicles in his line of vision which might affect his use of the highway; that, consistent with the need to drive according to conditions, a driver should drive at a safe and appropriate speed when approaching and crossing an intersection; and that it was up to the jury to decide from the evidence whether any of the aforementioned duties had been violated.

Instruction No. 18 imposes a special duty on passing at an unmarked intersection which is not based upon any statute. If an instruction is to be given on passing under the facts herein, it should be in accordance with K.S.A. 8-1516, the general passing-on-the-left statute. See PIK Civ. 2d 8.16(a). We conclude it was error to give Instruction No. 18.

### DUTY OF DRIVER TO RENDER ASSISTANCE

For their fifth and sixth issues, defendants contend the trial court erred in: (1) overruling their motion for a directed verdict on the claim of negligence based upon failure to render assistance to Richard Grossman after the accident; and (2) instructing the jury on the duty of defendants' drivers to render assistance to Grossman pursuant to K.S.A. 8-1604.

The statute in question, K.S.A. 8-1604, provides, in pertinent part:

"(a) *The driver of any vehicle involved in an accident resulting in injury to or death of any person,* or damage to any vehicle or other property which is driven or attended by any person, shall give such person's name, address and the registration number of the vehicle such person is driving,

and upon request shall exhibit such person's license or permit to drive, the name of the company with which there is in effect a policy of motor vehicle liability insurance covering the vehicle involved in the accident and the policy number of such policy to any person injured in such accident or to the driver or occupant of or person attending any vehicle or other property damaged in such accident, and shall give such information and upon request exhibit such license or permit and the name of the insurer and policy number, to any police officer at the scene of the accident or who is investigating the accident and *shall render to any person injured in such accident reasonable assistance, including the carrying, or the making of arrangements for the carrying of such person to a physician, surgeon or hospital for medical or surgical treatment if it is apparent that such treatment is necessary, or if such carrying is requested by the injured person."* (Emphasis supplied.)

The defendants contend there was no evidence presented that any failure to render assistance resulted in additional compensable injury to Grossman and that, accordingly, that aspect of the claim should not have remained in the case or been the subject of a jury instruction. We agree.

At this point, the facts relative to what transpired after the moment of impact must be set forth in some detail. As the Southwest truck was attempting to pass Grossman's flatbed truck and stock trailer, Grossman commenced a left turn onto the unmarked county road. The Southwest truck struck Grossman's truck at about the flatbed driver's side door. As a result of the impact, the flatbed's gasoline tank was severed and thrown from the vehicle and ignited. Grossman was thrown from the vehicle and rolled through the flames. He came to rest approximately five to six feet from the burning tank. A metal panel from the truck was lying across his body, obscuring all but one arm.

An approaching motorist saw the accident and explosion and arrived on the scene within one to one and one-half minutes. At first he did not see Grossman, but saw the two Southwest employees standing by their truck. He then saw the boy, Jon, who stated he was looking for his father. The motorist asked the Southwest employees if they knew where the boy's father was. The reply was that he was dead. Meanwhile, another person had arrived. The two of them found Grossman in a ditch. They knew he was alive because his breathing was causing the metal panel to move. Other persons arrived and attempted to put the tank fire out with fire extinguishers and shovels, but were unsuccessful.

After impact, the two trucks came to rest approximately 100 feet apart.

When the panel was removed from Grossman, it was observed he was badly burned. His clothing had mostly burned away, but was smoldering around the edges of his body. Neither of Southwest's employees assisted in the efforts to aid Grossman. Grossman was taken to a hospital, where he died three days later.

There was medical testimony that, generally, the longer a person is exposed to a fire, the greater is the tissue damage. However, significantly, there was no evidence that any delay in providing on-scene assistance caused Grossman's death or contributed thereto, resulted in increased pain and suffering, or resulted in increased medical expenses. From the evidence one can only conclude that the injuries received by Grossman as a direct result of the collision and immediate fire were terminal in nature. Or put another way, the evidence was that Grossman was fatally injured before there was any opportunity for assistance to be given and that no damages could be attributed to any failure to render assistance. Based upon these facts, it was error for the trial court to have permitted this specification of negligence to remain in the case and to instruct the jury thereon.

## CROSS-APPEAL

In their cross-appeal, plaintiffs raise several issues relative to the propriety of the order of remittitur entered herein which reduced the gross damage award from $1,290,000 to $1,000,000. Inasmuch as a new trial has been granted herein, there is no need to determine these issues.

The judgment of the district court is reversed and the case is remanded for a new trial.

HOLMES, C.J., and HERD, J., not participating.

MICHAEL J. MALONE, and ADRIAN J. ALLEN, district judges, assigned.