No. 69,583

WALLACE R. NOEL, LARRY D. NOEL, and MICHAEL L. NOEL, *Appellants*, v. PIZZA MANAGEMENT, INC., a corporation, and ARTURO G. TORRES, *Appellees*.
(899 P.2d 1013)

Opinion filed July 14, 1995.

*Robert Martin*, of Martin, Pringle, Oliver, Wallace & Swartz, L.C., of Wichita, argued the cause, and *Richard K. Thompson,* of the same firm, was with him on the briefs for appellants.

*Ron D. Beal*, of Klenda; Mitchell, Austerman & Zuercher, of Wichita, argued the cause, and *Gary M. Austerman,* of the same firm, was with him on the brief for appellees.

The opinion of the court was delivered by

SIX, J.: This case arises in a corporate setting and includes allegations of breach of fiduciary duty, breach of a third-party beneficiary contract, and fraud in the initial distribution of stock. The litigation is fueled by the tension resulting from Pizza Management, Inc.'s (PMI) failed attempt in 1986 to go public. PMI, a defendant, was a closely held Texas corporation and a franchisee of numerous Pizza Hut restaurants. The other defendant is Arturo G. Torres, PMI's president, chief executive officer, and majority shareholder, owning about 60 percent of PMI stock. The plaintiff, Wallace R. Noel, was a minority shareholder, owning 10 percent

of PMI. (Shortly after the organization of PMI, Noel gave some PMI shares to each of his two sons who are also plaintiffs in the instant case.)

Noel sold his PMI shares for over $3 million in 1990, at $8.25 per share, but contends he would have received at least $15 per share had the planned public offering in 1986 been successful. Noel originally filed this action against Pizza Hut, Inc. and PepsiCo, Inc. claiming that they wrongfully blocked PMI's attempted public offering. After a federal court held in a separate but related case, *Pizza Management, Inc. v. Pizza Hut, Inc.*, 737 F. Supp. 1154 (D. Kan. 1990), that Pizza Hut and PepsiCo acted within their rights, Noel adjusted focus and sought recovery from PMI and Torres. He essentially claimed he was unlawfully deprived of an opportunity to sell his PMI stock at a presumably higher price in the public market.

The district court granted summary judgment for Torres and PMI on Noel's third-party beneficiary contract claims, but denied summary judgment on the others. The jury found: (1) Torres breached certain fiduciary duties owing to Noel, but Noel suffered no damages as a result, and (2) no fraud in the initial stock distribution. The district court entered judgment for Torres and PMI, and Noel appeals.

The case has consumed much time and paper. The record on appeal consists of 89 volumes and, conservatively, over 20,000 pages of pleadings, motions, transcripts, and exhibits. The jury trial lasted over two months. The trial transcript exceeds 5,800 pages.

Our jurisdiction is under K.S.A. 20-3018(c) (a transfer from Court of Appeals by our motion).

## THE APPELLATE PREHEARING CONFERENCE ORDER

Retired Chief Justice David Prager, sitting by assignment, presided at two appellate prehearing conferences scheduled before the oral argument in this court. The parties agreed upon a concise statement of issues and a stipulation of undisputed facts as background for the appeal. We have addressed Noel's issues as set out in the prehearing conference order.

## ISSUES

Noel alleges: (1) trial error in the admission of evidence and refusal to give requested instructions, (2) an inconsistent jury verdict, (3) error by the district court in sustaining defendants' motion for summary judgment on Noel's third-party beneficiary claim and in responding to an earlier appeal in *Noel v. Pizza Hut, Inc.*, 15 Kan App. 2d 225, 805 P.2d 1244, *rev. denied* 248 Kan. 996 (1991), and (4) abuse of discretion in refusing to allow plaintiff leave to claim punitive damages.

We find no error and affirm.

## FACTS

### STIPULATION OF UNDISPUTED FACTS

"1. The basic facts underlying this appeal are as follows:

"2. In 1972, plaintiff Wallace R. Noel acquired the exclusive Pizza Hut franchise rights for the territories of Kerrville, New Braunfels, Seguin, Uvalde, and Eagle Pass, Texas.

"3. In 1973, Noel sold to defendant Arturo G. Torres a one-half interest in the Kerrville, New Braunfels and Seguin territories and the full interest in the Uvalde and Eagle Pass territories. About the same time, Noel and Torres formed a partnership to operate the Kerrville, New Braunfels and Seguin, Texas franchises. Noel and Torres owned equal shares in the partnership. Later in 1973, the Noel/Torres partnership was incorporated as BNT Enterprises, Inc. to operate Pizza Hut restaurants in the Kerrville, Seguin and New Braunfels territories.

"4. In 1974, Torres approached Noel and several other Pizza Hut franchisees with a proposal that these franchisees transfer their interests in the various Pizza Hut franchises they owned to a company Torres would form and manage in exchange for common stock in the newly formed company.

"5. In May 1975, a Texas corporation, Pizza Management, Inc. (PMI) was formed. In July 1975, stock in PMI was issued. Noel received 131,579 shares. At that point, Torres owned approximately 60% of the outstanding shares and Noel owned approximately 10%. Torres became Chairman of the Board and President of PMI. Noel became a vice president of PMI and a member of the Board of Directors for a short period of time. Shortly after the stock was first issued, Noel gave 1,000 shares of stock to each of his two sons, who are the other two plaintiffs in this action. Plaintiffs collectively owned more than 390,000 shares of PMI stock at the time of the attempted public offering of PMI stock in 1986.

"6. On November 1, 1976, a written agreement (the 1976 agreement) between Pizza Hut, as franchisor, and PMI and Torres, individually, was executed. The agreement provided as follows:

'WHEREAS, the franchise agreements listed above (the "Franchise Agreements") each have been or hereby will be assigned to PMI in order for such corporation to be the operating entity thereunder; and

◦ ◦ ◦

'WHEREAS, Torres and PMI desire that such restrictions on transfer be revised to allow free transferability of PMI shares by the shareholders of PMI other than him [Torres] and that such guarantee be applicable only to him and further to provide for the possible public offering of PMI's stock in the future and [f]or future issuance of shares by PMI (so long as Torres' ownership is maintained as herein provided); and

◦ ◦ ◦

'NOW, THEREFORE, in consideration of the mutual agreements contained herein, the parties agree as follows:

'1. PMI may issue and/or sell or otherwise lawfully issue additional shares of its stock from time to time and the shareholders of PMI other than Torres may sell, assign or transfer their PMI shares without any restrictions imposed by Pizza Hut, and PMI may register its shares under the provisions of the Texas Securities Act, subject to the restriction that Torres agrees that at all times he will take any and all actions necessary to cause him to remain the record and beneficial owner of at least fifty-one percent (51%) of the issued and outstanding shares of stock of PMI; provided, however, that in the event that the stock of PMI shall be sold in an underwritten public offering registered under the Securities Act of 1933, as amended, the foregoing restriction on ownership by Torres shall no longer apply, so long as Pizza Hut is given thirty (30) days prior written notice of such offering and approves the Prospectus and Registration Statement, and all amendments thereto, insofar as the same refers to Pizza Hut, its relationship to PMI and Pizza Hut's registered trademarks and trade-names, which approval will not be unreasonably withheld. PMI and Torres agree that such stock will not be offered by use of the name "Pizza Hut" except to reference the fact that PMI is a franchisee of Pizza Hut.'

"7. Noel did not assign his franchise territories to PMI until after he reviewed a copy of the 1976 agreement on February 1, 1977.

"8. In 1981, Pizza Hut adopted a new franchise agreement form called the 'Superseding Franchise Agreement' (SFA). By this time, Pizza Hut had been acquired by and was a wholly-owned subsidiary of PepsiCo, Inc. The 1981 SFA was to replace all of Pizza Hut's previous franchise agreements and it contained restrictions on the transferability of a corporate franchisee's shares and made a public offering by a franchisee dependent upon obtaining the consent of Pizza Hut, in advance. PMI refused to sign the 1981 SFA unless Pizza Hut reconfirmed, in writing, the public offering and share transferability rights expressed in the 1976 agreement.

"9. On July 20, 1981, Pizza Hut executed and delivered a document entitled "Blanket Amendment To Superseding Franchise Agreement" (1981 Blanket

Amendment) which confirmed the public offering and stock transferability rights of PMI in language essentially identical to that contained in the 1976 agreement. On the same date, PMI and Pizza Hut executed the new Superseding Franchise Agreements. At this point there was no violation of Noel's rights by Torres or PMI.

"10. Noel has contended throughout this litigation that he was a third-party beneficiary of the 1976 agreement and the 1981 Blanket Amendment. Torres and PMI have denied that Noel was a third-party beneficiary. Noel also contends that issue was decided in his favor in *Noel v. Pizza Hut, Inc., et al.*, 15 Kan. App. 2d 225, *rev. denied* 248 Kan. 996 (1991). The Kansas district court granted defendants' summary judgment on Noel's claim for relief based on his third-party beneficiary theory.

"11. In 1985, Pizza Hut and PMI discussed a trade of franchise territories PMI held in California, Oregon, and Illinois for franchise rights in certain cities and counties in Texas. The proposal was for PMI to assign to Pizza Hut 31 franchise units in California, Oregon, and Illinois in exchange for 44 franchise units in Texas. The exchange took place and is referred to by the parties as the 'Texas Swap' Transaction.

"12. In May 1986, Torres negotiated a purchase by PMI of the Pizza Hut franchise rights for the City of Madrid, Spain from Restaurant Associates, S.A. and John Finerty. The Pizza Hut franchise held by Finerty contained a provision requiring the prior written approval of PepsiCo for any assignment of Pizza Hut franchise rights. Prior written approval was not obtained, but the transaction was nevertheless closed. The parties refer to this transaction as the 'Restaurant Associates, S.A. Finerty' transaction.

"13. At various times, PMI entered into certain agreements with various PMI corporate officers, directors and 'friends.' The agreements authorized these persons to purchase stock at low prices. A total of 80,000 shares of PMI stock was involved. The parties refer to these agreements as deferred compensation agreements or as subscription and buy-back agreements.

"14. In 1986, PMI, acting through Torres, employed counsel and engaged an underwriting firm, Shearson Lehman Brothers, for the purpose of publicly issuing new shares of PMI stock. Pizza Hut blocked the public offering by refusing to give its consent, relying in part on the Texas Swap, and the public offering never took place.

"15. In July 1986, Torres and PMI filed suit against Pizza Hut and PepsiCo in the United States District Court for the District of Kansas. In 1987, both plaintiffs and defendants in the federal litigation filed motions for partial summary judgment on the issue whether Pizza Hut and PepsiCo had breached the terms of the 1976 agreement and 1981 Blanket Amendment by refusing to consent to the 1986 public offering.

"16. In May 1988, Noel filed the present action against Pizza Hut and PepsiCo in Sedgwick County District Court contending he sustained substantial damages

in 1986 when the proposed public offering was blocked by Pizza Hut and PepsiCo. PMI and Torres were later added as party defendants.

"17. On April 14, 1989, in the federal litigation, the United States District Court granted Pizza Hut and PepsiCo partial summary judgment and ruled that, as a matter of law, Pizza Hut had acted within its rights and did not breach the 1976 agreement or the 1981 Blanket Amendment by refusing to permit PMI to go forward with the 1986 public offering. Torres and PMI perfected an appeal to the United States Court of Appeals for the Tenth Circuit which was dismissed by the parties as part of a settlement agreement.

"18. In 1990, Noel sold his stock to PepsiCo for $8.25 per share for a total of $3,250,071.00 in cash in order to avoid a mortgage foreclosure on certain real estate and any potential deficiency judgment.

"19. In 1992, PMI conveyed to Pizza Hut and PepsiCo all of its Pizza Hut franchises and restaurants. The price realized by PMI shareholders in a combination of cash and stock in PepsiCo amounted to $73,144,000, the equivalent of more than $21.00 per share. At that time, the case in federal court was dismissed.

"20. Noel contends he suffered a minimum of $2.6 million in damages in 1986 due to the actions of Torres and PMI in connection with the Texas Swap transaction, the Restaurant Associates, S.A./Finerty transactions and the deferred compensation agreements which led to the blocking by Pizza Hut of the contemplated public offering. Torres and PMI contend that Noel did not suffer any damages as a result of their actions, but any damages were the result of Noel's own actions.

"21. The jury found PMI and Torres had breached fiduciary duties related to the Texas Swap transaction, the Restaurant Associates, S.A./Finerty transaction, and the deferred compensation agreements but that Noel had sustained $0 damages."

## DISCUSSION
### Admission of Certain Evidence

Noel contends that the district court erroneously admitted irrelevant and prejudicial evidence. He challenges the admission of evidence concerning his (1) divorce, (2) prior investments, (3) financial statements dating from the 1970s, (4) federal income tax return for 1990, and (5) sale of PMI stock to Pizza Hut and PepsiCo in 1990. He does not explain why these items concerning his personal and financial history were not relevant. Instead, citing cases from other jurisdictions, he states that "[t]he prior or existing financial condition of an injured party is neither material nor relevant in determining either liability or damages in an action for compensatory damages." He claims that Torres and PMI used such evidence to "highlight and support their improper assertion that

Noel's personal history, financial condition and investment practices were somehow responsible for the damages which flowed from the failed public offering."

The defendants assert that Noel failed to preserve these evidentiary issues for appeal. Noel claims his counsel "objected repeatedly to the admission of such evidence." His citations to the record, however, show objections only to the introduction of his 1972-74 and 1977-81 financial statements.

Noel explains his failure to object to the other items this way: "When it became clear that further objections to such evidence were futile, plaintiffs' counsel ceased to make objections to avoid delay in the trial and alienation of the jury." Noel does not provide any citation to the record in support of his explanation. He does not allege, for example, that his counsel requested a continuing objection covering all of the evidence now challenged on appeal. Consequently, except for his pre-1981 financial statements, Noel has failed to show that his counsel objected at trial. The failure to object waives a challenge on appeal. K.S.A. 60-404; *Anderson v. Scheffler*, 248 Kan. 736, 742, 811 P.2d 1125 (1991).

As to his pre-1981 financial statements, Noel challenges their admission solely on grounds of relevance. Rulings on relevance rest in the sound discretion of the district court. Consequently, our standard of review is abuse of discretion. See *Herbstreith v. de Bakker*, 249 Kan. 67, 83, 815 P.2d 102 (1991). The determination of relevancy is more a matter of logic and experience than it is a matter of law. *McGuire v. Sifers*, 235 Kan. 368, 371, 681 P.2d 1025 (1984).

Torres and PMI contend that Noel's pre-1981 financial statements were relevant to discredit the damages model Noel developed at trial. Noel claimed that he was damaged in two ways by the failure of PMI to go public in 1986: (1) He was unable to sell his PMI stock in the initial public offering and aftermarket—*i.e.*, lost proceeds, and (2) he was unable to invest and "use" the proceeds of such a sale from 1987 to the present—*i.e.*, lost "earnings appreciation." Noel introduced his damages calculations through the testimony of an expert witness, Paul Allen, a certified public accountant. Using Allen's calculations, Noel alleged $7.1 million in

lost proceeds on his 393,000 shares of PMI, plus $4.7 million in lost "earnings appreciation" on those proceeds, for a total of $11.8 million. Noel then subtracted $3.8 million to account for his 1990 sale of PMI stock to Pizza Hut. Thus, Noel alleged $8 million in total damages.

Allen made numerous assumptions which were challenged by the defense. For example, Allen assumed that Noel would have sold all of his PMI stock by October 1, 1987, which would have been within one year after the planned public offering. Allen admitted that the only reason given to him for that assumption was, "that [was] the intent of Mr. Noel." Torres and PMI, meanwhile, reminded the jury that on October 19, 1987, the stock market fell dramatically. Defense counsel revealed the effect the fall had on the stock of National Pizza, Inc., a company similar to PMI, which declined from $16 to $9 per share in the downturn. Thus, the defense argued Noel's damages model was based on a convenient but unsupported (except by his own testimony) assumption that he would have sold *all* of his PMI stock *before* October 1987, when the price likely would have fallen.

More pertinent to the pre-1981 financial statements, the defense attacked Noel's claim for $4.7 million in "earnings appreciation" on his lost proceeds. First, Torres and PMI challenged the legal basis for the claim, describing it as a veiled attempt to recover prejudgment interest before the claim was liquidated. Noel convinced the district court to permit him to argue for "earnings appreciation" damages.

Having lost on the initial admissibility question, the defendants challenged the facts and assumptions underlying Noel's claim for $4.7 million in lost "earnings appreciation." As an estimated rate of return on Noel's $7.1 million in claimed lost proceeds, Allen used the Standard & Poor's 500 index (S & P 500), explaining that the S & P 500 was a general indicator of stock market performance. Allen therefore assumed that Noel would have invested all of his $7.1 million and fared at least as well as the S & P 500 from 1987 to the present. According to Allen, the S & P 500 recorded increases of 16.6 percent in 1988 and 31.7 percent in 1989 (although

it is not clear whether those were yearly, quarterly, or monthly figures).

The defendants countered by introducing evidence of Noel's personal track record on investments, which was not as successful as the S & P 500. The track record included his pre-1981 financial statements as well as financial information from 1987 to the present. For example, Noel lost $357,000 investing in a T.J. Cinnamons franchise between 1988 and 1990. The defense also suggested that Noel lost $3 million in oil-based securities when oil prices dropped. Noel's financial statements dating from 1972 provided a history of Noel's personal investment tendencies. These financial statements, the defendants contend, "showed a history of investments in race horses, real estate, vacation homes, [and] oil and gas ventures, not in stocks represented by the Standard & Poor's 500." Defense counsel urged the jury to "follow [Noel's] track record and investments" rather than the S & P 500 in considering any "earnings appreciation" damages.

An examination of Noel's financial statements supports the defendants' assertion that he invested in many things other than S & P 500 stocks, and had mixed results. We conclude that the district court did not abuse its discretion in finding Noel's pre-1981 financial statements relevant and in admitting his financial history. Noel does not challenge the accuracy of the information contained in his financial reports. He had ample opportunity to argue to the jury what it should and should not consider important. The issue of whether "earnings appreciation" is distinguishable from prejudgment interest and recoverable as damages is not before us.

## Jury Instructions on Damages

Noel argues that the district court erred in instructing the jury on damages. He identifies two specifics: the district court's refusal to give (1) his requested instruction that tortfeasors must take their victims as they find them (a "thin-skull" instruction) and (2) the full version of his requested instruction on mitigation of damages. See 4 Harper, James & Gray, The Law of Torts § 20.3 n.25 (2d ed. 1986) (noting that the damages principle being discussed is commonly called the thin-skull rule).

The rules governing the standard for our review of alleged errors in jury instructions are well established:

"It is the duty of the trial court to properly instruct the jury upon a party's theory of the case. Errors regarding jury instructions will not demand reversal unless they result in prejudice to the appealing party. Instructions in any particular action are to be considered together and read as a whole, and where they fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. If the instructions are substantially correct, and the jury could not reasonably be misled by them, the instructions will be approved on appeal." *Cerretti v. Flint Hills Rural Electric Co-op Ass'n*, 251 Kan. 347, 353, 837 P.2d 330 (1992).

"A court should not by its instructions unduly emphasize one aspect of a case." *Guillan v. Watts*, 249 Kan. 606, 617, 822 P.2d 582 (1991).

Noel first challenges the district court's refusal to give the following "thin-skull" instruction, which he requested:

"The law requires that one who causes injury to another must accept the injured person's condition at the time and must accept liability for all consequences flowing from plaintiffs' injury even though the injury was rendered more severe by the condition of the person injured."

Noel contends that the above instruction is a correct statement of Kansas law and was "essential" to his case. The defendants assert (1) Texas law governs; the instruction is an incorrect statement of Texas law, and (2) the instruction has no application to this case.

We need not address the choice of law question. The instruction is not applicable to the case at bar.

Noel claims the instruction was necessary "to cure defendants' improper contentions and arguments . . . directed toward the irrelevant and prejudicial evidence relating to Noel's financial condition and investment history." We have previously noted that much of the so-called "irrelevant and prejudicial evidence" was admitted without objection and that, in any event, it was relevant to the issue of damages. Noel's contention therefore starts from the erroneous assumption that irrelevant and prejudicial evidence of his financial history was admitted.

As an example of alleged "improper" argument, Noel cites statements in closing argument in which defense counsel suggested that

Noel's personal investments "caused his problem," and that "[w]hen he sold his stock in 1990 he did it for his own reasons." Although Noel now contends that those comments were improper and required a "cure" in the form of his thin-skull instruction, Noel did not object when they were made. Moreover, Noel's request for the thin-skull instruction came *before* closing arguments. Thus, the argument that the thin-skull instruction was necessary to "cure" an improper statement in closing argument is not persuasive.

Noel further asserts that defense counsel's comments were an improper attempt by Torres and PMI to escape liability by dictating how Noel should have used his personal funds. He cites *Collins v. Morris*, 97 Kan. 264, Syl. ¶ 4, 155 Pac. 51 (1916), and *Barker v. Railway Co.*, 94 Kan. 61, 66, 145 Pac. 829 (1915). Both *Collins* and *Barker* discuss the appropriate measure for tortious damage to trees. Under *Collins* and *Barker*, the wrongdoer may not avoid damages by arguing that the victim's real estate as a whole is just as valuable without the trees as it was with them. What Noel claims to have lost is the right to sell his PMI shares in the public market. He does not claim that the right to sell his shares *publicly* had any distinct value separate from the value of the shares themselves—unlike trees that have value separate from the real estate's value as a whole. Simply put, *Collins* and *Barker* have no application here, factually or legally.

Noel's thin-skull instruction states that a wrongdoer "must accept the injured person's condition *at the time.*" (Emphasis added.) Noel's citation of *Knoblock v. Morris*, 169 Kan. 540, 545-46, 220 P.2d 171 (1950), as legal precedent for the instruction suggests that the instruction refers to a victim's preexisting condition *at the time of injury.* Noel's injury from the alleged wrongdoing of Torres and PMI would have been complete in 1986, when the public offering failed. Yet, Noel contends that the thin-skull instruction was necessary to counteract evidence and arguments about Noel's subsequent financial troubles and transactions in 1990. There is no indication Noel had any preexisting financial problems in 1986, at the time of his injury. Noel's contentions about why the instruction was required do not correspond with the focus of the instruction. The trial judge did not err in refusing to give the instruction.

## Mitigation of Damages Instruction

Noel next contends that the district court erred in refusing to give the full version of his requested instruction on mitigation of damages. Noel requested a two-paragraph instruction, but the district court used only the first paragraph. The jury received the following instruction, which was essentially verbatim from the first paragraph of Noel's requested mitigation instruction:

"The law requires a party to mitigate his damages. Mitigation of damages requires an injured party to make reasonable efforts to minimize his harm or loss. If an injured party fails to make a reasonable effort and his harm from injury [is] greater than it would have otherwise been, he can not recover damages for the preventable loss. A party does not have to obtain the highest price in mitigating his damages, but the party need only act reasonably and prudently in his mitigation efforts."

The second paragraph of Noel's requested instruction, which was not given, stated:

"The plaintiff Noel contends that by 1990 his financial condition was such that he was forced to sell virtually all plaintiffs' stock in PMI at a price below its true value and the anticipated public offering price to avoid probable bankruptcy and mitigate plaintiffs' losses. Such a sale would not bar plaintiffs' recovery, but credit must be given for sale proceeds actually received."

Noel again claims that the rejected paragraph was "essential" to counteract "the improper personal attack on plaintiff carried out through the reception of irrelevant and highly prejudicial evidence." Noel does not identify which attacks were improper or which evidence was irrelevant and highly prejudicial; presumably, he refers to the evidence of his financial condition and investment history which has been previously discussed in the opinion. Noel complains that without the second paragraph, the jury may have concluded that the 1990 sale of his PMI stock barred recovery for his 1986 damages. There is no way to determine from the jury's verdict whether it actually followed that reasoning in awarding Noel zero damages.

The defendants contend that the district court correctly refused to give Noel's second requested paragraph because it "improperly highlighted or placed an emphasis on [plaintiffs'] version of the facts." We agree. Specifically, defendants disputed Noel's factual

assertion that he was "forced" to sell his PMI shares to avoid probable bankruptcy. They contend that Noel was not forced to sell his PMI shares, but elected to liquidate his shares rather than lose real property to foreclosure. See Stipulated Fact No. 18.

"Instructions should be avoided that are slanted, argumentative, or formulated to particularize one aspect of a case." *Schwartz v. Western Power & Gas Co., Inc.*, 208 Kan. 844, 854, 494 P.2d 1113 (1972).

While we question Noel's characterization of his 1990 sale as "mitigation," the issue of whether such characterization was proper is not before us. The district court did not err in refusing to instruct the jury on the second requested paragraph.

## The Verdict

Noel advances several arguments in support of his contention that the jury's verdict of zero damages was inconsistent with its finding that the defendants breached fiduciary duties, and contrary to the evidence and the instructions. Noel raised this contention in a motion for new trial under K.S.A. 60-259, which was denied. Subject to limited exceptions that do not apply here, the decision of whether to grant or deny a new trial rests in the sound discretion of the district court and will not be reversed on appeal unless a clear abuse of discretion is shown. See *Peoples Bank of Pratt v. Integral Ins. Co.*, 251 Kan. 809, Syl. ¶ 1, 840 P.2d 503 (1992).

Noel first asserts estoppel. Torres and PMI claimed in the federal litigation against Pizza Hut and PepsiCo $57 million in damages because of the failed public offering. Noel contends Torres and PMI should be estopped in the case at bar from claiming that Noel suffered no damages. Noel does not state how this argument fits into his claim that he should have been granted a new trial. He did not raise the estoppel contention in the district court in support of his new trial motion. A point not presented below generally will not be considered for the first time on appeal. *Hephner v. Traders Ins. Co.*, 254 Kan. 226, 231, 864 P.2d 674 (1993). Although the question is not preserved for appeal, we observe that the assertion is not well taken. A damage claim by PMI and Torres against Pizza

Hut and PepsiCo is not an admission that they, PMI and Torres, damaged Noel.

Noel next contends that the jury verdict of zero damages was "contrary to all of the evidence as to the value of PMI shares if a public offering could have been carried out; and is in conflict with the verdict on liability." The evidence he cites as contrary to the verdict concerns the predicted price of PMI shares in the initial public offering and secondary market. He contends there is "no evidence in the record that the [initial public offering] price would have been less than $15.00 per share or the aftermarket price less than $15.00—$27.25 per share."

Noel seems to assume, at this point, that the jury awarded him no damages based on a finding that PMI shares would not have been as valuable in a public offering as he claimed. As the defendants contend, however, the verdict could be explained in other ways. The jury may have concluded that: (1) Noel failed to prove that the breaches of fiduciary duty caused the failure of PMI to go public and, thus, failed to proved that the defendants caused his damages; (2) Noel offered insufficient proof of his alleged damages; or (3) Noel's 1990 sale of his PMI stock was an unreasonable act of "mitigation" according to his own damages model and, had he acted reasonably, he would have suffered no damages. We will consider these possibilities briefly.

The verdict form asked the jury to answer the following questions:

(1) whether "a fiduciary relationship existed between Wallace R. Noel and Defendants regarding a public offering of PMI stock?";

(2) whether "defendants breached any fiduciary duty owing to plaintiffs relating to . . . : The 'Texas Swap' transaction? . . . The Restaurant Associates, S.A. Finerty transaction? . . . The accounting methods utilized and the subscription and buy-back agreements?"; and

(3) "[w]hat amount of damages, if any, do you find were sustained by the Plaintiffs as a result of the Defendants' conduct regarding the public offering?"

The jury answered "Yes" to the first question and to each part of the second question, and wrote in "$0" in response to the third

question. The jury was not asked to make specific findings on questions of causation, proof of damages, or whether Noel's 1990 sale was reasonable. The only question on the verdict form incorporating causation was, "What amount of damages, if any, do you find were sustained by the Plaintiffs *as a result of* the Defendants' conduct regarding the public offering?" The jury responded, "$0."

"Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved in that manner." *Brunner v. Jensen*, 215 Kan. 416, Syl. ¶ 6, 524 P.2d 1175 (1974).

Torres and PMI contended at trial and now on appeal that Noel failed to prove causation between the defendants' breaches of fiduciary duty and PMI's failure to go public. In support, the defendants pointed to, among other things, the testimony of Steven S. Reinemund, president and chief executive officer of Pizza Hut at the time PMI attempted to go public. Reinemund said that Pizza Hut "never had any intentions of ever approving" PMI's proposed public offering. Thus, the defendants contend that any breaches of fiduciary duty that they may have committed with respect to the Texas Swap, the Finerty transaction, and the accounting methods were not the cause of PMI's failure to go public.

Torres and PMI plainly emphasized "no causation" to the jury during closing argument. Defense counsel argued that "the swap didn't have anything to do with PMI not going public in 1986. The Finerty transaction had nothing to do with PMI not going public in 1986 . . . . and on and on." Reinemund's testimony offers at least some support for that line of argument, and that argument drew no objection from the plaintiffs. "Upon appellate review this court accepts as true the evidence, and all inferences to be drawn therefrom, which support, or tend to support, the special findings, verdict, and judgment below, and disregards any conflicting evidence or other inferences which might be drawn therefrom." *Brunner*, 215 Kan. 416, Syl. ¶ 4. Other PMI shareholders, including Torres, sold their shares two years after Noel's sale to Pizza Hut and PepsiCo for over $21 per share. The jury's verdict may be explained based on a finding of no causation.

Torres and PMI further contend that the jury may have found insufficient evidence of Noel's damages or a failure by Noel to reasonably mitigate his damages. These contentions need not be considered in detail since we have already found one plausible explanation for the jury's verdict. See *Brunner*, 215 Kan. 416, Syl. ¶ 6.

Finally, Noel contends that because the district court was surprised at the zero-damages verdict, the court was required to set the verdict aside and grant a new trial. After the verdict was announced and the jury was dismissed, the trial judge stated, "I would expect even defense counsel was surprised by [the zero-damages finding]," and that he would add the verdict "to the list of things that mystify me in this life." Noel has not directed our attention to any authority holding that a district court has a duty to set aside a verdict that comes as a surprise. The district court expressed no disapproval of the verdict, only surprise. Noel moved for a new trial, which was denied.

Noel has failed to show an abuse of discretion by the district court's refusal to grant a new trial based on the jury's zero-damages verdict.

### Third-Party Beneficiary Claim

Noel argues that the district court erred in granting summary judgment for defendants on his third-party beneficiary contract claims. The district court explained that while some of Noel's allegations under his contract claims were pertinent to his other legal theories, Noel had no actionable rights as a third-party beneficiary of the 1976 and 1981 agreements.

In reviewing a grant of summary judgment, we apply the same standards as the district court. *Kerns v. G.A.C., Inc.*, 255 Kan. 264, 268, 875 P.2d 949 (1994). All evidence and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Summary judgment should be upheld only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. K.S.A. 60-256(c); *Kerns*, 255 Kan. at 268. Our review of the record and of the parties' contentions convinces us that summary judgment was a proper pro-

cedural vehicle for resolving the third-party beneficiary claim. See *Fletcher v. Nelson*, 253 Kan. 389, 391, 855 P.2d 940 (1993) (rules relating to summary judgment reviewed).

Noel first contends that the district court failed to follow the "opinion and mandate" in *Noel v. Pizza Hut, Inc.*, 15 Kan. App. 2d 225, 234-35, 805 P.2d 1244, *rev. denied*, 248 Kan. 996 (1991) (*Noel I*). In *Noel I*, the Court of Appeals reviewed the district court's dismissal of the third-party beneficiary claim on a motion to dismiss under K.S.A. 60-212(b)(6). Examining only the well-pleaded facts and allegations, *Noel I* concluded that Noel's petition stated a claim under a third-party beneficiary theory and reversed the district court. 15 Kan. App. 2d at 237.

Contrary to Noel's suggestion, a prior ruling that dismissal of his third-party beneficiary claim under K.S.A. 60-212(b)(6) was improper did not preclude the district court from later entering summary judgment against that claim under K.S.A. 60-256(c). See 10 Wright, Miller & Kane, Federal Practice & Procedure: Civil 2d § 2713, p. 604 (1983) ("The ruling on a motion to dismiss for failure to state a claim for relief is addressed solely to the sufficiency of the complaint and does not prevent summary judgment from subsequently being granted based on material outside the complaint."). The summary judgment was entered after substantial discovery. The district court had the benefit of reviewing the 1976 and 1981 agreements in considering the summary judgment motion. The district court did not act in conflict with the mandate of *Noel I*.

Noel next contends that summary judgment was improper, relying on the following language, which appeared in both the 1976 and 1981 agreements.

"PMI may issue and/or sell or otherwise lawfully issue additional shares of its stock from time to time *and the shareholders of PMI, other than Torres, may sell, assign or transfer their PMI shares without any restriction imposed by Pizza Hut.*" (Emphasis added.)

The problem with Noel's contention, as the defendants point out, is that his first and second claims for relief do not allege a breach of any obligation contained in the 1976 or 1981 agreements.

Noel contends that: (1) Pizza Hut promised in the 1976 and 1981 agreements to allow PMI to go public; (2) the promise created a corresponding right in the shareholders to take PMI public; and (3) Torres and PMI, under Torres' command, destroyed the shareholders' right (to take advantage of Pizza Hut's promise that PMI could go public) by engaging in certain transactions. Nowhere in the agreements at issue between Pizza Hut and PMI, however, does PMI assume any obligation to its shareholders to go public. The 1976 and 1981 agreements speak of PMI's anticipated public offering only as a "possible" event. The defendants thus contend that Noel's claim based on some breach of the 1976 and 1981 agreements is misguided.

Noel's response in his reply brief undermines his third-party beneficiary theory. He contends:

"The fact that the 1976 and 1981 Amendments express no obligation on the part of defendants to carry out a public offering cannot provide a defense since *the obligation of defendants to conduct a public offering arises from the agreements, plans and undertakings of Torres to the original shareholders entered into when PMI was formed and the franchise rights were transferred.* It was unnecessary to include in the 1976 and 1981 Amendments any obligation on the part of defendants to conduct a public offering because that obligation had already been expressed and agreed upon between Torres and the original shareholders. *It existed independently of the written agreements with Pizza Hut.*"

Noel's PMI-formation argument reveals that to the extent Noel asserts the existence and breach of any contractual rights owing to him concerning PMI's failed public offering, such rights arose "independently of the written agreements with Pizza Hut." Noel's proper action in contract, if any such contract existed, would have been against Torres based not on the 1976 and 1981 agreements, but on Torres' alleged promise to take PMI public as an inducement for and in consideration of Noel's investment. However, Noel never alleged the existence or breach of any such contract in his four amended petitions or in his pretrial questionnaire. The district court did not err in granting summary judgment in favor of Torres and PMI on Noel's third-party beneficiary claims.

<u>Punitive Damages</u>

Noel's final contention is that the district court erred in denying

him leave to amend his petition to add a claim of punitive damages. The procedure for claiming punitive damages is set forth in K.S.A. 60-3703 and was recently considered in *Fusaro v. First Family Mortgage Corp.*, 257 Kan. 794, 897 P.2d 123 (1995).

K.S.A. 60-3703 requires that a plaintiff first obtain permission from the court before amending his or her pleading to include a claim for punitive damages in a tort action. The motion must be filed "on or before the date of the pretrial conference held in the matter." K.S.A. 60-3703. The district court may allow the amendment if the plaintiff is able to establish a "probability that the plaintiff will prevail" on the punitive damages claim at trial. K.S.A. 60-3703.

Before the pretrial conference, Noel filed a motion for leave to file a fourth amended petition that would have added a claim for punitive damages under his fifth claim for relief, which alleged fraud in the initial distribution of PMI stock. Noel's motion did not seek punitive damages in connection with his third and fourth claims for relief, which alleged breaches of fiduciary duty in connection with the failed public offering.

The district court denied Noel's motion to amend, holding that it was "not persuaded (under K.S.A. 60-3703) of the probability Plaintiff will prevail upon a claim of punitive damages" under his claim of fraud on the initial stock distribution.

During trial, Noel twice moved to amend the pleadings to claim punitive damages based on the third and fourth claims for relief. The district court denied both motions without explanation. On appeal, Noel contends there was sufficient evidence concerning his third and fourth claims to establish a probability he would prevail on a claim of punitive damages.

The defendants contend that Noel never sought leave to claim punitive damages concerning his third and fourth claims and that if he did, such an attempt was untimely. We reason that Noel's motion to amend his pleadings during trial sufficiently referenced his third and fourth claims; however, we agree that the motion was untimely. K.S.A. 60-3703 expressly provides that a motion to amend the pleadings to claim punitive damages must be made "on or before the date of the pretrial conference."

Noel argues that under *Newton v. Hornblower, Inc.*, 224 Kan. 506, Syl. ¶ 13, 582 P.2d 1136 (1978), he was entitled to claim punitive damages under his breach of fiduciary duty claims. Noel did not seek leave to assert the claim until two weeks after trial had begun. His claim was too late. The breach of fiduciary duty claim of punitive damages was available when Noel made his timely motion to seek punitive damages on his fraud in the distribution claim (his fifth claim). Nevertheless, he waited until trial was well under way before attempting to claim punitive damages for breach of fiduciary duty.

Noel argues that because he filed a timely motion to seek punitive damages, the district court had the power to reconsider its ruling in response to the motion renewed at trial. Noel relies on *Burrowwood Assocs., Inc. v. Safelite Glass Corp.*, 18 Kan. App. 2d 396, 398, 853 P.2d 1175 (1993). *Burrowwood* is distinguishable. In *Burrowwood*, there is no indication the plaintiffs enlarged or expanded their motion to claim punitive damages beyond what was timely requested. In the case at bar, Noel's untimely motion to seek punitive damages on his third and fourth claims (breach of fiduciary duty resulting in the failed public offering) cannot be said to have been included in his timely motion for punitive damages based on alleged fraud in the initial distribution of PMI stock and in an alleged "freeze-out" plan by Torres. Thus, Noel's timely motion for punitive damages on some claims does not rescue his untimely motion concerning other claims, which were based on different facts and different legal theories.

The only question remaining is whether the district court erred in denying Noel's motion for leave to claim punitive damages on his fifth claim for relief, which alleged fraud in the initial distribution of PMI stock. Because of the jury's verdict, however, it is not necessary to consider whether Noel met his burden of probable success under K.S.A. 60-3703. The jury found no fraud concerning the initial distribution of PMI stock.

The defendants cross-appeal, contending that summary judgment should have been granted in their favor on all claims, raising questions of standing and statutes of limitation, among other

things. Our affirmance of the district court's judgment disposes of the cross-appeal issues.

Affirmed.